## COX *v.* UNITED STATES.

NO. 66.

Argued October 14–15, 1947.—Decided November 24, 1947.

*Hayden C. Covington* argued the cause and filed a brief for petitioners.

*Irving S. Shapiro* argued the cause for the United States. With him on the brief were *Solicitor General Perlman* and *Robert S. Erdahl*.

MR. JUSTICE REED announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, MR. JUSTICE JACKSON, and MR. JUSTICE BURTON join.

These cases present the question of the scope of review of a selective service classification in a trial for absence without leave from a civilian public service camp. Petitioners are Jehovah's Witnesses who were classified as conscientious objectors despite their claim to classification as ministers of religion. Ministers are exempt from military and other service under the Act. All three petitioners exhausted their remedies in the selective service process and complied with the order of the local board directing them to report to camp. Cox and Thompson were indicted for leaving the camp without permission, and Roisum was indicted for failing to return after proper leave, in violation of § 11 of the Selective Training and Service Act of 1940. 54 Stat. 885, 57 Stat. 597, 50 U. S. C. Appendix §§ 301–318.

On their trials petitioners requested directed verdicts, at appropriate times, because the selective service orders were invalid and requested the court to charge the jury that they acquit petitioners if they found that they were ministers of religion and therefore exempt from all service. The trial judge did not grant petitioners' requests, however, and instructed the juries that they were not to concern themselves with the validity of the classification orders. Petitioners were convicted, and on appeal

444

to the Circuit Court of Appeals their convictions were affirmed. 157 F. 2d 787. We granted certiorari in order to resolve questions concerning the submission to the jury of evidence, to wit, the files of the local board of the selective service system, as relevant to the charge of violation of selective service orders. 331 U. S. 801.

Petitioner Cox registered under the Selective Training and Service Act on October 16, 1940, and in his questionnaire stated that he was 22 years old and had been employed as a truck driver since 1936. The local board classified him IV–F, as not physically fit for service, on January 31, 1941, and on March 10, 1942, changed the classification to I–A. Ten days later Cox filed a request for reclassification as IV–E (conscientious objector), stating that he had become a Jehovah's Witness in January 1942. The board at first rejected the claim, but on June 12 of the same year granted him the requested classification. Ten days later petitioner first made his claim for total exemption from service, claiming to be a minister of religion; the local board refused the exemption and its action was sustained by the board of appeal. On May 18, 1944, the board ordered Cox to report to camp, and on May 26 he complied and then immediately left camp and did not return.

Upon trial Cox's selective service file was received in evidence. It contained an ordination certificate from the Watch Tower Bible and Tract Society stating that Cox was "a duly ordained minister of the Gospel" and that his "entire time" was devoted to missionary work. The file also contained an affidavit of a company servant, Cox's church superior, dated October 29, 1942, stating that Cox "regularly and customarily serves as a minister by going from house to house and conducting Bible Studies and Bible Talks." There was also an affidavit by Cox, dated October 28, 1942, stating that he was enrolled in the "Pioneer service" on October 16 and that he was "able

to average 150 hours per month to my ministerial duties without secular work." He added that "my entire time will be devoted to preaching the Gospel as a pioneer." Cox testified at the trial in October 1944 as to his duties as a minister that he preached from house to house, conducted funerals, and "instructed the Bible" in homes. No evidence was introduced showing the total amount of time Cox had spent in religious activities since October 16, 1942. Nor was there evidence of the secular activities of Cox nor the time employed in them. Although the selective service file was introduced in evidence, and the trial court denied the motion for a directed verdict, it does not appear that the trial judge examined the file to determine whether the action of the local board was arbitrary and capricious or without basis in fact. At that time the lower federal courts interpreted *Falbo* v. *United States,* 320 U. S. 549, as meaning that no judicial review of any sort could be had of a selective service order. In *Estep* v. *United States,* 327 U. S. 114, we held that a limited review could be obtained if the registrant had exhausted his administrative remedies, and the Circuit Court of Appeals in accordance with that decision reviewed the file of Cox and found that the evidence was "substantially in support" of the classification found by the board.

Petitioner Thompson also registered on October 16, 1940, claiming exemption as a minister. He stated in his questionnaire that he was 30 years old and that for the past 13 years he had operated a grocery store and had been a minister since August 1, 1940. At first the local board gave him a deferred classification because of dependency, but then changed his classification to IV–E. Thompson appealed to the board of appeal on November 5, 1943, explaining his duties as a minister and presenting a full statement of his argument that as a colporteur he was within the exemption for ministers as interpreted by

selective service regulations. He attached an affidavit from the company servant, which stated that Thompson during the preceding twelve months had devoted 519½ hours to "field service," representing time spent in going from house to house, and making "back-calls on the people of good will," but not including time spent in conducting studies at the "local Kingdom Hall." Another affidavit from the company servant stated that Thompson was an ordained minister of the Gospel, that he was serving as assistant company servant, and that he was a "School Instructor in a Course in Theocratic Ministry." Thompson also attached three certificates from the national headquarters of the Watch Tower Bible and Tract Society which stated that Thompson had been associated with the Society since 1941, that he served as assistant company servant and Theocratic Ministry Instructor, and also as advertising servant and book study conductor. Unlike the other two petitioners, Thompson did not introduce an ordination certification from national headquarters stating that he devoted his entire time as a minister. Thompson also filed a statement signed by twelve Witnesses which stated that they regarded Thompson as an ordained minister of the gospel. No evidence was submitted indicating any change in Thompson's activities in operating his grocery store. The board of appeal sustained the local board in its classification, the board ordered Thompson to report to camp, and on April 18, 1944, he reported and immediately left. Thompson's trial followed the same pattern as Cox's, except that Thompson was not allowed to testify concerning his duties as a minister.

Petitioner Roisum also registered on the initial registration day, and filed a questionnaire stating that he was 22 years old, that he had worked for the past 15 years as a farmer, and that he was ordained as a minister in June 1940. Roisum made claim to a minister's ex-

emption but at the same time submitted an affidavit signed by his father saying that petitioner was necessary to the operation of his father's farm. In June 1942 Roisum filed a conscientious objector's form claiming exemption from both combatant and non-combatant military service; this form was apparently filed under misapprehension, since Roisum did not abandon his contention that he should be classified as a minister. In the form he stated that he preached the gospel of the Kingdom at every opportunity. Roisum also enclosed a letter from national headquarters of the Society stating that Roisum had been affiliated with the Society since 1936, that he had been baptized in 1940 and "was appointed direct representative of this organization to perform missionary and evangelistic service in organizing and establishing churches and generally preaching the Gospel of the Kingdom of God in definitely assigned territory in 1941" and that Roisum devoted his "entire time" to missionary work and was a duly ordained minister. The local board classified Roisum as a conscientious objector to combat service (I–A–O), and Roisum appealed on June 30, 1943. Roisum attached an affidavit from his company servant stating that Roisum was an assistant company servant, a back call servant, and book study conductor, and that by performance of these duties Roisum had acquitted himself as a "regular minister of the gospel." The company servant submitted a schedule showing the number of hours which Roisum had spent in religious activities for six months from October 1942 to March 1943, ranging from as little as 11 hours per month to as many as 69, averaging about 40. The board of appeal changed the classification to IV–E and rejected Roisum's request that an appeal be taken to the President. Roisum was ordered to report to camp, disobeyed the order, and was arrested and indicted. The trial court declared a mistrial on Roisum's undertaking to obey the board's order

and seek release on *habeas corpus.* Roisum subsequently failed to comply, apparently because of transportation difficulties, but finally reported to camp on May 23, 1944, as directed. He remained in camp for five days, left on a week-end pass, and never returned.

Upon trial Roisum made no effort to introduce new evidence showing the nature of his duties as a minister. He did request the court to charge that if the decision of the local board erroneously classified him in IV–E the order was void and after conviction he moved for a judgment of acquittal or a new trial on the ground that the evidence in his selective service file showed that the classification of the board was arbitrary and capricious. The trial judge examined the file and concluded that there was no ground to support Roisum's motion.

Petitioners are entitled to raise the question of the validity of their selective service classifications in this proceeding. They have exhausted their remedies in the selective service process, and whatever their position might be in attempting to raise the question by writs of *habeas corpus* against the camp custodian, they are entitled to raise the issue as a defense in a criminal prosecution for absence without leave. *Gibson* v. *United States,* 329 U. S. 338, 351–360. The scope of review to which petitioners are entitled, however, is limited; as we said in *Estep* v. *United States,* 327 U. S. 114, 122–23: "The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no

basis in fact for the classification which it gave the registrant." Compare *Eagles* v. *United States ex rel. Samuels,* 329 U. S. 304, and *Eagles* v. *United States ex rel. Horowitz,* 329 U. S. 317, in which a similar scope of review is enunciated in *habeas corpus* proceedings by registrants claiming to have been improperly inducted.

Section 5 (d) of the Selective Training and Service Act provides that "regular or duly ordained ministers of religion" shall be exempt from training and service under the Act, and § 622.44 of Selective Service Regulations defines the terms "regular minister of religion" and "duly ordained minister of religion." [1] In order to aid the local boards in applying the regulation, the Director of Selective Service issued Opinion No. 14 (amended)

---

[1] 54 Stat. 885, 888:

"Sec. 5. . . .

"(d) Regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service (but not from registration) under this Act."

Selective Service Regulations, 32 C. F. R., 1941 Supp.:

Section 622.44. *"Class IV–D: Minister of religion or divinity student.* (a) In Class IV–D shall be placed any registrant who is a regular or duly ordained minister of religion or who is a student preparing for the ministry in a theological or divinity school which has been recognized as such for more than 1 year prior to the date of enactment of the Selective Training and Service Act (September 16, 1940).

"(b) A 'regular minister of religion' is a man who customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained as a minister of religion; and who is recognized by such church, sect, or organization as a minister.

"(c) A 'duly ordained minister of religion' is a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies in public worship; and who customarily performs those duties."

on November 2, 1942,[2] which described the tests to be applied in determining whether Jehovah's Witnesses were entitled to exemption as ministers, regular or ordained. The opinion stated that Witnesses who were members of the Bethel Family (producers of religious supplies) or pioneers, devoting all or substantially all of their time to the work of teaching the tenets of their religion, generally were exempt, and appended a list of certain members of the Bethel Family and pioneers who were entitled to this exemption. None of these Witnesses were on the list. The opinion stated that members of the Bethel Family and pioneers whose names did not appear on the list, as well as all other Witnesses holding official titles in the organization, must be classified by the boards according to the facts in each case. The determining criteria were stated to be "whether or not they devote their lives in the furtherance of the beliefs of Jehovah's Witnesses, whether or not they perform functions which are normally performed by regular or duly ordained ministers of other religions, and, finally, whether or not they are regarded by other Jehovah's Witnesses in the same manner in which regular or duly ordained ministers of other religions are ordinarily regarded." The opinion further stated that the local board should place in the registrant's file "a record of all facts entering into its determination for the reason that it is legally necessary that the record show the basis of the local board's decision."

It will be observed that § 622.44 of the regulation makes "ordination" the only practical difference between a "regular" and a "duly ordained minister." This seems consistent with § 5 of the Act. We are of the view that the regulation conforms to the Act and that it is valid under the rule-making power conferred by § 10 (a). We agree,

---

[2] Opinion 14 (amended) is on file at the Office of Selective Service Records, Washington, D. C.

also, that Opinion 14 furnishes a proper guide to the interpretation of the Act and Regulations.

Our examination of the facts, as stated herein in each case, convinces us that the board had adequate basis to deny to Cox, Thompson and Roisum classification as ministers, regular or ordained. We confine ourselves to the facts appearing in the selective service files of the three petitioners, although the only documents dealing with the petitioners' status as ministers were submitted by petitioners themselves. The documents show that Thompson and Roisum spent only a small portion of their time in religious activities, and this fact alone, without a far stronger showing than is contained in either of the files of the registrants' leadership in church activities and the dedication of their lives to the furtherance of religious work, is sufficient for the board to deny them a minister's classification. As for Cox, the documents suggest but do not prove that Cox spent full time as a "pioneer" between October 1942 and May 1944 when he was ordered to camp. As he made claim of conscientious objector classification only after he was reclassified I–A from IV–F and still later claimed ministerial exemption, the board was justified in deciding from the available facts that Cox had not established his ministerial status. The board might have reasonably held that nothing less than definite evidence of his full devotion of his available time to religious leadership would suffice under these circumstances.[3] Nor

---

[3] For a similar conclusion under the same subdivision of the statute, giving exemption to regular and duly ordained ministers of religion and students, see *Eagles* v. *Samuels*, 329 U. S. 304, 316–17:

"Nor can we say there was no evidence to support the final classification made by the board of appeal. Samuels' statement that he was best fitted to be a Hebrew school teacher and spiritual leader, the two-year interruption in his education, his return to the day session of the seminary in the month when his selective service questionnaire was returned, and the fact that the seminary in question was appar-

may Cox and Thompson complain that the district court failed to pass on the validity of the classification orders. If there was error of the district court in failing to examine the files of the board to determine whether or not there was basis for their classification, it was cured in the Circuit Court of Appeals by that court's examination.

Petitioners do not limit themselves to the claim that directed verdicts should have been entered in their favor because of the invalidity of their classifications as a matter of law; they claim that the issue should have been submitted with appropriate instructions to the jury.[4] The charge requested by Roisum that he be acquitted if the jury found that he was "erroneously" classified was improper. In *Estep* v. *United States* it was distinctly stated that mere error in a classification was insufficient grounds for attack. Cox and Thompson requested charges under which the jury would determine "whether or not the defendant is a minister of religion" without considering the action of the local board. We hold that such a charge would also have been improper. Whether there was "no basis in fact" for the classification is not

---

ently not preparing men exclusively for the rabbinate make questionable his claim that he was preparing in good faith for the rabbinate. A registrant might seek a theological school as a refuge for the duration of the war. Congress did not create the exemption in § 5 (d) for him. There was some evidence that this was Samuels' plan; and that evidence, coupled with his demeanor and attitude, might have seemed more persuasive to the boards than it does in the cold record. Our inquiry is ended when we are unable to say that the board flouted the command of Congress in denying Samuels the exemption."

[4] The Circuit Court of Appeals on April 5, 1946, ordered the judgments in these cases reversed on the ground that the jury should have passed on petitioners' claims. Upon rehearing the opinion was withdrawn, and on October 4 the court handed down an opinion affirming the judgments. 157 F. 2d 787. In *Smith* v. *United States,* 157 F. 2d 176, the Circuit Court of Appeals held that the submission of the issue of classification to the jury constituted reversible error. But cf. *United States ex rel. Kulick* v. *Kennedy,* 157 F. 2d 811.

a question to be determined by the jury on an independent consideration of the evidence. The concept of a jury passing independently on an issue previously determined by an administrative body or reviewing the action of an administrative body is contrary to settled federal administrative practice; the constitutional right to jury trial does not include the right to have a jury pass on the validity of an administrative order. *Yakus* v. *United States,* 321 U. S. 414. Although we held in *Estep* that Congress did not intend to cut off all judicial review of a selective service order, petitioners have full protection by having the issue submitted to the trial judge and the reviewing courts to determine whether there was any substantial basis for the classification order. When the judge determines that there was a basis in fact to support classification, the issue need not and should not be submitted to the jury. Perhaps a court or jury would reach a different result from the evidence but as the determination of classification is for selective service, its order is reviewable "only if there is no basis in fact for the classification." *Estep* v. *United States, supra,* 122. Consequently when a court finds a basis in the file for the board's action that action is conclusive. The question of the preponderance of evidence is not for trial anew. It is not relevant to the issue of the guilt of the accused for disobedience of orders. Upon the judge's determination that the file supports the board, nothing in the file is pertinent to any issue proper for jury consideration.[5]

Petitioners also claim that they were denied the right to introduce new evidence at the trial to support their contention that the orders were invalid. Roisum made no attempt to introduce such evidence, Cox was in fact

---

[5] For an analogous power of a judge as to admissibility, see Wigmore (3d ed.) § 2550; *Steele* v. *United States No. 2,* 267 U. S. 505, 510–11; *Ford* v. *United States,* 273 U. S. 593, 605; *Doe dem. Jenkins* v. *Davies,* 10 Ad. & E. N. S. 314, 323–24; Phipson, Evidence (8th ed.), p. 9.

allowed to testify as to his duties as a minister, and only Thompson was denied the opportunity so to testify. Thompson did not specify this point as error in his appeal to the Circuit Court of Appeals. Passing the possible waiver on the part of Thompson by failing to argue this point below, we hold that his contention is without merit. Petitioner claims that his status as a minister is a "jurisdictional fact" which may be determined *de novo* (reexamination of the record of the former hearing with right to adduce additional evidence) in a criminal trial, and relies on *Ng Fung Ho* v. *White,* 259 U. S. 276, where we held that an alleged alien was entitled to a judicial trial on the issue of alienage in *habeas corpus* proceedings. But that case is different from this. The alien, there, claimed American citizenship. As such, this Court said, he had a right to a judicial hearing of his claim as a matter of due process. This he could not get before the Commissioner of Immigration. Therefore, since the deportation of a citizen may involve loss "of all that makes life worth living," this Court decided that the "jurisdiction" of the Commissioner to try the alleged alien could be tested by *habeas corpus.* P. 284. That gave the alleged alien a judicial hearing. In these cases judicial review of administrative action is allowed in the criminal trial. This assures judicial consideration of a registrant's rights. Petitioners' objection on this point is in essence that the review is limited to evidence that appeared in the administrative proceeding. It seems to us that it is quite in accord with justice to limit the evidence as to status in the criminal trial on review of administrative action to that upon which the board acted.[6] As we have said elsewhere the board records were made by petitioners. It was open to them there to furnish full information as to

---

[6] See *Goff* v. *United States,* 135 F. 2d 610, and *United States* v. *Messersmith,* 138 F. 2d 599.

their activities. It is that record upon which the board acted and upon which the registrants' violation of orders must be predicated.

We perceive no error to petitioners' prejudice in the records.

*Affirmed.*

MR. JUSTICE FRANKFURTER concurs in the result.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I agree with the majority of the Court that we can reverse the judgments below only if there was no basis in fact for the classification. I also agree that that question is properly one of law for the Court. To that extent I join in the opinion of the Court. But I do not agree that the local boards had adequate basis to deny to petitioners the classification of ministers. My disagreement is required by what I conceive to be the mandate of Congress, that all who preach and teach their faith and are recognized as ministers within their religious group are entitled to the statutory exemption.

The exemption runs to "regular or duly ordained ministers of religion." There is no suggestion that only ministers of the more orthodox or conventional faiths are included. Nor did Congress make the availability of the exemption turn on the amount of time devoted to religious activity. It exempted all regular or duly ordained ministers. Hence, I think the Selective Service Regulations properly required that a "regular" minister, as distinguished from a "duly ordained" minister,[1] only be

---

[1] A "duly ordained" minister is defined as one "who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies

one who "customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained as a minister of religion; and who is recognized by such church, sect, or organization as a minister." 32 C. F. R. Cum. Supp. § 622.44 (b).

It is not disputed that Jehovah's Witnesses constitute a religious sect or organization. We have, moreover, recognized that its door-to-door evangelism is as much religious activity as "worship in the churches and preaching from the pulpits." *Murdock* v. *Pennsylvania,* 319 U. S. 105, 109. The Selective Service files of these petitioners establish, I think, their status as ministers of that sect. Their claims to that status are supported by affidavits of their immediate superiors in the local group and by their national headquarters. And each of them was spending substantial time in the religious activity of preaching their faith. If a person is in fact engaging in the ministry, his motives for doing so are quite immaterial.[2]

To deny these claimants their statutory exemption is to disregard these facts or to adopt a definition of minister which contracts the classification provided by Congress.

The classification as a minister may not be denied because the registrant devotes but a part of his time to religious activity. It is not uncommon for ordained min-

---

in public worship; and who customarily performs those duties." 32 C. F. R. Cum. Supp. § 622.44 (c).

The distinction between "regular" and "duly ordained" ministers is, I think, more than the ordination of the latter. The "duly ordained" minister performs all the customary functions of a minister of a church. The concept of "regular" minister more nearly fits those who, like Jehovah's Witnesses, follow less orthodox or conventional practices.

[2] *Eagles* v. *Samuels,* 329 U. S. 304, is not controlling here. It involved the exemption given students preparing for the ministry. Mere presence in a school not exclusively confined to preparing men for the rabbinate did not entitle the student to exemption.

isters of more orthodox religions to work a full day in secular occupations, especially in rural communities. They are nonetheless ministers. Their status is determined not by the hours devoted to their parish but by their position as teachers of their faith. It should be no different when a religious organization such as Jehovah's Witnesses has part-time ministers. Financial needs may require that they devote a substantial portion of their time to lay occupations. And the use of part-time ministers may be dictated by a desire to disseminate more widely the religious views of the sect. Whatever the reason, these part-time ministers are vehicles for propagation of the faith; by practical as well as historical standards they are the apostles who perform the minister's function for this group.

MR. JUSTICE MURPHY, with whom MR. JUSTICE RUTLEDGE concurs, dissenting.

With certain limitations, this Court has recognized that a person on trial for an alleged violation of the Selective Training and Service Act has the right to prove that the prosecution is based upon an invalid draft board classification. But care must be taken to preclude the review of the classification by standards which allow the judge to do little more than give automatic approval to the draft board's action. Otherwise the right to prove the invalidity of the classification is drained of much of its substance and the trial becomes a mere formality. Such empty procedure has serious connotations, especially when we deal with those who claim they have been illegally denied exemptions relating to conscientious beliefs or ministerial status.

Specifically, I object to the standard of review whereby the draft board classification is to be sustained unless there is no evidence to support it. Less than a substantial amount of evidence is thus permitted to legalize the clas-

sification. Whatever merit this standard may have in other situations, I question the propriety of its use in this particular setting. This differs from an ordinary civil proceeding to review a non-punitive order of an administrative agency, an order which is unrelated to freedom of conscience or religion. This is a criminal trial. It involves administrative action denying that the defendant has conscientious or religious scruples against war, or that he is a minister. His liberty and his reputation depend upon the validity of that action. If the draft board classification is held valid, he will be imprisoned or fined and will be branded as a violator of the nation's law; if that classification is unlawful, he is a free man. Moreover, he has had no previous opportunity to secure a judicial test of this administrative action, no chance to prove that he was denied his statutory rights. Everything is concentrated in the criminal proceeding.

These stakes are too high, in my opinion, to permit an inappreciable amount of supporting evidence to sanction a draft board classification. Since guilt or innocence centers on that classification, its validity should be established by something more forceful than a wisp of evidence or a speculative inference. Otherwise the defendant faces an almost impossible task in attempting to prove the illegality of the classification, the presence of a mere fragment of contrary evidence dooming his efforts. And such a scant foundation should not justify brushing aside bona fide claims of conscientious belief or ministerial status. If respect for human dignity means anything, only evidence of a substantial nature warrants approval of the draft board classification in a criminal proceeding.

It is needless to add that, from my point of view, the proof in these cases falls far short of justifying the conviction of the petitioners. There is no suggestion in the record that they were other than bona fide ministers.

And the mere fact that they spent less than full time in ministerial activities affords no reasonable basis for implying a non-ministerial status. Congress must have intended to exempt from statutory duties those ministers who are forced to labor at secular jobs to earn a living as well as those who preach to more opulent congregations. Any other view would ascribe to Congress an intention to discriminate among religious denominations and ministers on the basis of wealth and necessity for secular work, an intention that I am unwilling to impute. Accordingly, in the absence of more convincing evidence, I cannot agree that the draft board classifications underlying petitioners' convictions are valid.