**PETERSON v. UNITED STATES.**

No. 10621.

United States Court of Appeals
Sixth Circuit.

March 7, 1949.

Writ of Certiorari Denied June 6, 1949.

See 69 S.Ct. 1169.

---

[7] The Buenos Aires, 2 Cir., 5 F.2d 425.

[8] The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586.

Hayden C. Covington, of Brooklyn, N. Y. (Victor F. Schmidt, of Rossmoyne, Ohio, on the brief), for appellant.

Ferdinand Powell, Jr., of Knoxville, Tenn. (Otto T. Ault, of Chattanooga, Tenn., on the brief), for appellee.

Before ALLEN, MARTIN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

On August 10, 1943, appellant, Peterson, registered under the provisions of the Selective Training and Service Act, 50 U.S.C.A. Appendix; § 301 et seq. In his Selective Service questionnaire, he stated, among other matters, that he was eighteen years of age; that he was single and contributed to no one's support; that he then was, and had been, a minister of Jehovah God since he was thirteen years old; that, as a member of Jehovah's Witnesses, he could not participate in war; that he was a general farmer, raising cattle and crops; that he was joint owner with his father of the farm on which he worked; and that there was no one else to work the farm except himself. In the space provided for such statement, appellant wrote that in his opinion, he should be classified as II-C—a farmer essential to agriculture during the war.

On August 20, 1943, appellant was classified by his local board as II-C. On March 18, 1944, he signed a Selective Service farm report, setting forth the number of acres of the farm which he was operating, the amount of livestock, size of crops, and other agricultural data. This was a report required to be filled out and filed with the local board of a registrant for whom farm deferment was sought. On April 15, 1944, the Wayne County, New York, Agricultural Defense Committee reported to appellant's local draft board that, as a result of its investigation of appellant with respect to whether he was doing a job that would warrant a continuance of his agricultural deferment and classification, it recommended that no deferment be given him.

On April 18, 1944, appellant was classified as I-A—available for full military service. On April 27, 1944, appellant appealed the I-A classification in a letter written his local draft board, in which he stated that he believed he should be classified II-C because of the evidence he submitted that he was engaged in farming over two hundred acres of land. He recited the acreage of wheat and rye he had planted, as well as preparation of the land for oats, and his intention to plant additional crops. He told also of considerable new agricultural machinery that he had just secured, mentioned the fact that his father could not help with the farm work, and concluded with the statement that the board would notice on his questionnaire that he was one of Jehovah's Witnesses and could not take part in combatant service of any kind.

On May 2, 1944, appellant was ordered to report for physical examination, and on May 8, 1944, was found physically fit for military service.

On June 12, 1944, the appeal board had received the appeal from the I-A classification and noticed appellant's statement that he was a Jehovah's Witness. With this information in its possession, the appeal board wrote the local board, stating that it was classifying appellant II-C for six months, giving as a reason the fact that the Wayne County Agricultural Committee's report recommending against deferment was rather ambiguous in that it might be taken as a statement that they considered the man not necessary in agriculture or that they were investigating as to whether or not he was necessary. The appeal board

further stated to the local board that in view of the size of the farming operation, "and the fact that the registrant also claims deferment as a Conscientious Objector, although he failed to file DSS Form 47, it seemed to us to be best to leave him where he is." Accordingly, on June 15, 1944, the appeal board formally classified appellant as II-C for a period until December 10, 1944. But only two days later, on June 17, 1944, the United States Department of Agriculture informed the local board that the War Board did not consider appellant essential to agriculture. This was the first time that the local board had knowledge that there was no justification in classifying appellant as II-C.

It was about the same time that the local board also became aware of the conscientious objector problem with respect to appellant. Apparently, it was not until it had received the above mentioned letter of June 12, 1944, from the appeal board that it discovered that appellant had not signed the statement on his questionnaire required of those who expressed a conscientious objection to war, although he had indicated that he had such objection. The local board had not theretofore considered the question of conscientious objection with respect to appellant but had been deferring him as a farmer whose work was necessary to the war effort.

In the Selective Service questionnaire, there was a heading, "Conscientious Objection To War" followed by this instruction: "Any registrant who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form shall sign the statement below requesting a Special Form for Conscientious Objector (Form 47) from the local board which must be completed and returned to the local board for consideration."

Following the above instruction, there was printed the following: "By reason of religious training and belief I am conscientiously opposed to war in any form and 'for this reason request that the local board furnish me a Special Form for Conscientious Objector (Form 47) which I am to complete and return to the local board." Underneath the above statement was a blank for the registrant's signature. In this space, appellant wrote the following: "As one of Jehovah's Witnesses and a soldier in the Lord's army I can't participate in any other warfare." Appellant apparently, however, overlooked the affixing of his signature beneath the foregoing statements. The local board, after being notified by the appeal board that appellant failed to sign the special form claiming deferment as a conscientious objector, wrote him on June 16, 1944, stating that at the time he filled out the questionnaire, he had written out a statement that he would not participate in any warfare, but that he had not signed it. The local board then informed appellant that if he wished to sign such statement, to come to the office. Appellant did so, and thereafter signed the statement that by reason of religious training and belief, he was conscientiously opposed to war in any form. He also signed the "Special Form for Conscientious Objector" on August 9, 1944. At this time, then, the local board had the report of the Department of Agriculture that appellant was not a farmer essential to the war effort, and also had notice of appellant's claim of conscientious objection to war.

On August 11, 1944, in consideration of the foregoing, the local board classified appellant as IV-E—a conscientious objector to combatant and non-combatant military service and available for work of national importance.

On September 22, 1944, appellant and his father appeared before the local board to make an appeal from the classification of August 11, 1944; and although no request for a personal appearance had been made within the ten-day period from the decision of the local board, as provided by the regulation, Peterson was granted such hearing, in the exercise of the discretion of the local board, and thereafter appealed. On October 28, 1944, the appeal board classified the appellant as IV-E. In accordance with instructions from the government, appellant reported for work of national importance in January, 1945, and thereafter, in May, 1946, deserted from the civilian service camp when a claim which he had filed for discharge based on support of his dependent father was rejected.

On a trial in the district court, appellant was convicted of willfully leaving and thereafter continuously absenting himself from a Civilian Public Service Camp in violation of Title 50 U.S.C.A.Appendix, § 311; and he subsequently took his appeal to this court.

Appellant contends that, before the local draft board, he asserted the claim to be exempt from all military training and service on the ground that he was a minister of religion; and that the local board deprived him of his right to a full and fair hearing before the board of appeal by failing to reduce to writing and placing in his file new and additional oral evidence [1] which he submitted on his personal appearance before the board to the effect that he was exempt from service as a minister of religion; that the local board thereby withheld from the board of appeals the entire record on a hearing de novo, and thus denied appellant the rights to which he was entitled by law, inasmuch as appellant was not permitted to appear in person before the appeal board. Appellant, at the conclusion of the proofs, moved the district court for a judgment of acquittal on the ground that he had been deprived of a fair hearing by the local board on his appeal to the appeal board, for the reason that his record on appeal did not contain the evidence required to be therein set forth; that his classification was, therefore, illegal; and that he was, accordingly, guilty of no offense in leaving the camp. In support of the defense that appellant's classification was unlawful, he testified with reference to the claim in his questionnaire that he was a conscientious objector and a minister. He further told of the several classifications he had received from the local and appeal boards, and recounted that after he had received a II-C classification, he had a hearing before the local board.

Up to this point in the testimony, nothing had been said with respect to whether or not appellant had ever made a claim for exemption as a minister. However, appellant was then asked by his counsel:

"Q. Now then, tell us whether or not, upon that period you had a session with the Board, with respect to your claim for exemption as a minister? A. Yes, I did."

Appellant then went on to say that he told the board he was an ordained minister, taking the message of God from door to door, and had been engaged in that work continuously since he was thirteen years old; that the board's contention that he wasn't a minister because he didn't engage in that work full time was because he had to take up some other work to keep going; and that that other work was farming. He also testified that he had been instructed by his parents, ever since he had been able to learn, as to the word of God, had studied the Bible, conducted religious meetings, preached, and had led book study and readings at meetings.

We have scrutinized the record in this case, and while there is testimony by appellant that he told the board that he was a minister, there is nowhere any testimony by appellant or anyone else that he ever claimed exemption from military service on the ground that he was a minister of religion. He appeared to be too innately honest, to testify that he actually made such a claim expressly or with any degree of particularity. Moreover, appellant fixed the time of the hearing before the local board at which he asserts he told them that he was a minister as being after the time he had been classified as II-C, and during the time he was so classified. It is difficult to understand why any hearing should have been held at such time. Hearings are to determine classifications. Appellant already, at the time in question, had his classification, and one with which he was satisfied. It would appear that there was some confusion in his mind about this matter, perhaps resulting from the number of occasions on which he was classified and reclassified.

Instead of there being any proof that appellant claimed exemption from military service on the ground that he was a minister of religion, the evidence is entirely to the effect that he not only did not claim exemption from military service as a minister, but on every occasion on which he had the opportunity, claimed the classification of II-C, as a farmer essential to wartime agri-

---

[1] Selective Service Regulation, Section 625.2. Code of Federal Regulations, Cum.Supp., P. 9175 (1944).

culture. In his Selctive Service questionnaire, he advised the draft board that in view of the facts set forth, his opinion was that he should be classified II-C; and he was so classified. When he was reclassified I-A in April, 1944, he immediately appealed, claiming again that he should be classified II-C, on the basis of evidence already submitted; and the appeal board consequently reclassified him II-C. When he was finally reclassified IV-E, he appealed once more, and on the trial, testified that he again asked to be reclassified from IV-E to II-C. More than a year after he had been at the civilian service camp, he wrote the President and the Director of Selective Service, reciting tragic occurrences in his family—the death of his mother from cancer subsequent to his assignment to the camp, the complete physical disability of his father, and the fact that no one else was operating or could operate the farm. In the letters, he requested discharge from the camp because of the necessity of supporting his father and because of his being a farmer.

One of the reasons a registrant is given the opportunity to appear before the local draft board is to discuss his classification, point out the class in which he thinks he should have been placed, direct attention to any information in his file which he thinks the board may have overlooked, and present such further information as he believes will assist the board in determining his proper classification. Selective Service Regulations, Section 625.-2.[2] In this case, appellant pointed out to the board the class in which he thought he should have been placed, and all the information he gave the board was to assist it in determining his classification as II-C. His last act before either of the boards was to appeal from the final classification of IV-E, and to ask that he be again classified II-C. Under these circumstances, the contention now made that he had sought exemption from service on the ground that he was a minister of religion seems unjustified, and such a claim appears to be only an afterthought. In any event, as we have held, there is no evidence that he ever claimed such exemption before the board as a minister of religion, and the argument that the board deprived him of a fair hearing by failing to send up a record to the appeal board setting forth that he made a claim of such exemption, and thereby prevented him from being classified as a minister, is unsupported by the evidence.

With respect to the argument that the failure of the local board to give appellant a preinduction physical examination within ninety days before the date he was ordered to report for work of national importance invalidates such order, this court ruled adversely to appellant's present contention in Miller v. United States, 6 Cir., 169 F.2d 865.

Contrary to appellant's claim, he was not, under Section 625.2 of the Selective Service Regulations, denied due process because he was refused the right to be represented by counsel in the hearings before the draft boards. United States v. Pitt, 3 Cir., 144 F.2d 169. He was not entitled to a judicial trial before the draft boards, but rather to judicial review, in the criminal proceedings, of the board's administrative action, as was given him in this case. This assured judicial consideration of his rights. Cox v. United States, 332 U.S. 442, 68 S.Ct. 115.

In accordance with the foregoing, the judgment of the district court is affirmed.

---

[2] Code of Federal Regulations, Cum.Supp., P. 9175 (1944).