**DICKINSON v. UNITED STATES.**

No. 13165.

United States Court of Appeals, Ninth Circuit.

March 9, 1953.

Writ of Certiorari Granted June 15, 1953.

See 73 S.Ct. 1136.

Hayden C. Covington, Brooklyn, N. Y., and John Brill, San Francisco, Cal., for appellant.

Chauncey Tramutolo, U. S. Atty., and Joseph Karesh, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

This is an appeal from a judgment of conviction after trial without a jury upon an indictment charging a refusal to submit to induction and be inducted into the armed forces of the United States in violation of § 12 of the Selective Service Act of 1948, Title 50 U.S.C.A., War, Appendix, § 462 (a).

The appellant, a resident of San Francisco, registered with Local Board No. 37 in that City, and thereafter filed his classification questionnaire on December 10, 1948. He there stated that he was a minister of religion of the Jehovah's Witnesses and had been such since July 1, 1947, although he had not been formally ordained. In response to the question as to the job he was now working at he replied: "I am a minister and support myself by doing radio work at night." Describing the kind of work he did in his present job, he said: "Test tubes, repair radar, interrogator responder equipment". He stated that his employer was the United States Navy at San Francisco naval shipyard. Included in his file in the office of the local board was an additional statement on a separate paper which was apparently filed with the questionnaire. In this he stated that he was prepared to show that as his customary vocation he preached and taught the principles of a religious organization of which he was a member; "and that I am not a person who irregularly or incidentally preaches and teaches the principles of such organization as a regular minister." He stated that he conducted two meetings a week, each one lasting one hour; that he spent time preparing for these meetings, and several hours each week contacting the public and teaching and preaching to interested people. He said that the work which he had described in his questionnaire is done on the swing shift "allowing me the time in the Lord's service." Attached to this statement were certificates purporting to be signed by three individuals reciting that they knew the appellant, that he performed duties as a minister, and that he preached regularly the doctrines of the Watchtower Bible and Tract Society.

The questionnaire also stated that he worked an average of 40 hours a week at his radio job for which he was paid $11.36 per day. He asked classification in class IV–D as a minister of religion. On July 31, 1950, the local board placed him in class I–A. He complained about this and requested a personal appearance before the local board, which he had on September 7, 1950. Following this personal appearance, the board placed in his file the following purported summary of what he stated on that occasion:

"9/7/50

Dickinson
Public Bldg. where he preaches.
Has not been ordained.
Devotes his full time to the work of preaching.
Supports himself through this work.
Jehovah's witness."

At the trial the appellant testified at length as to what transpired on the occasion of this appearance before the board. He said that the chairman asked him what education he had for the ministry, to which he replied that he had studied the Bible and had delved into other text books of Jehovah's Witnesses with respect to the history of the Bible, the history of Christianity, and related subjects; that he had been given a course on how to prepare and write sermons. After describing at length this

training, he said he explained to the board that since his questionnaire was filed, he had given up the job which he then had as a radio technician and had taken up the ministry as his principal vocation; that he had been officially ordained in April, 1949, and was enrolled by the headquarters of Jehovah's Witnesses as a full-time pioneer minister in August, 1949. He said he told the board that as a "fulltime pioneer minister" he devoted 100 hours per month to the work of getting acquainted with people at their doors, leaving Bible literature with them and calling back upon the same persons, and that his work included offering Watchtower magazines to people on the streets. He also stated that he told the Board that in January, 1950, he was assigned to be the overseer of a congregation of people in Coalinga, California, and that he displayed to them the letter making this assignment, along with other similar letters giving him instructions about his work. He said he explained that at Coalinga Jehovah's Witnesses maintained a hall in which meetings were held three and sometimes four times a week, and it was his duty to preach at these meetings and that he delivered the discourses for most of them. He told the board that his missionary responsibility in his position as a pioneer minister extended to an area of 5400 square miles.

He also told the local board in response to their inquiry that he was paid no salary by Jehovah's Witnesses but that he supported himself as a radio man; that he made about $35 a month doing that kind of work and worked about five hours a week at it. He testified that the board was skeptical about his ability to live on $35 a month, but that he explained to them he could since his apartment cost him only $15 a month, he did his own cooking and often was invited to eat out.

He submitted at the time of this personal appearance an affidavit of one C. David Easter which recited that the affiant was an ordained minister of the Watchtower Bible and Tract Society of San Francisco; that he knew that appellant was officially in charge of the missionary work of that organization in a 5400 square miles territory with headquarters at Coalinga, California; that previously appellant had worked with affiant in San Francisco devoting his full time to the ministry, and that appellant had been enrolled "as a full time pioneer minister" by national headquarters as of August 1, 1949.

Following this September 7 appearance before it, the board upon review of the information it then had, classified the appellant in class I-A—available for military service,—and gave him notice. He was ordered to report for a physical examination, was found acceptable, and appealed to the Board of Appeal, where he was again classified in Class I-A on February 19, 1951. He then wrote to the National Director of the Selective Service System requesting that his classification be appealed from the appeal board to the National Appeal Board, and on April 10, 1951, his request was granted and the appeal was taken. A review was had by the National Appeal Board and on June 5, 1951, the members of that Board unanimously voted to place appellant in Class I-A.[1] He was ordered to report for induction on July 16, 1951, and did so report but on the following day he refused to submit to induction or be inducted and his indictment and conviction followed.

It is argued that appellant was justified in refusing to submit to induction because the order for his induction was illegal and void for two reasons. It is said that the local board failed to reduce to writing the additional information which he gave them on the occasion of his personal appearance,

1. The questionnaire which appellant filed disclosed that he had first signed the section claiming conscientious objection to war and then scratched out his signature. Following the action of the National Appeal Board appellant obtained and filed a conscientious objector form with the local board. On July 12, 1951, the board reviewed the file and the conscientious objector form and refused to reopen the case. No attempt was made to take any further appeal with respect to the denial of his conscientious objector claim, and appellant does not upon this appeal raise any question with respect thereto.

that this failure was in violation of the applicable selective service regulations, and that it operated to deny him procedural due process to which he was entitled. The other contention is that there was no basis in fact for the boards' denial of appellant's claim for exemption as a minister of religion, and that the action in placing him in the I–A classification was so arbitrary, capricious and without basis in fact, that it must be held to have been in excess of the boards' jurisdiction.

The regulations which were in force pursuant to the provisions of the Selective Service Act of 1948, 50 U.S.C.A.Appendix, § 451 et seq., provided that a registrant should have an opportunity to appear in person before the members of the local board; that at such appearance he might discuss his classification and indicate how he thought he should be classified and why; and that he might present any additional information which he then had, after which the board was charged with considering the new information and with classifying him again. The regulation further provided, with respect to the further information which the registrant might present, that "such information shall be in writing, or, if oral, shall be summarized in writing and, in either event, shall be placed in the registrant's files." [2]

It will be recalled that the information furnished on this occasion was partly in writing and partly oral. The written information was the affidavit of C. David Easter. The only summarization of the oral statement of appellant was that which we have noted above indicating the day by the figures "9/7/50". The argument is that compliance with the regulations' provision for the placing in the file of a written summary of the additional information furnished by the registrant, is of importance because if such a summary is missing from his file the fact that this additional information has been given is not available to the appeal board when it considers an appeal and again classifies the registrant. Such has been held in United States v. Zieber, 3 Cir., 161 F.2d 90, 92, and in Niznik v. United States, 6 Cir., 173 F.2d 328, 332. In each of these cases the court held that it was not encumbent upon the local board to make any written summary or to do anything to the registrant's file except insofar as the registrant at his personal appearance furnished "further information", that is to say, information not otherwise available to the board in the registrant's files.[3] Both courts held that whether the registrant furnished this "further information" and whether the same was placed in the cover sheet or file was a question of

---

2. Code of Federal Regulations, 1949 Ed., Title 32, Ch. XVI, Part 1624, § 1624.-2(b): "At any such appearance, the registrant may discuss his classification, may point out the class or classes in which he thinks he should have been placed, and may direct attention to any information in his file which he believes the local board has overlooked or to which he believes it has not given sufficient weight. The registrant may present such further information as he believes will assist the local board in determining his proper classification. Such information shall be in writing, or, if oral, shall be summarized in writing and, in either event, shall be placed in the registrant's file. The information furnished should be as concise as possible under the circumstances. The member or members of the local board before whom the registrant appears may impose such limitations upon the time which the registrant may have for his appearance as they deem necessary."

3. "If the oral evidence introduced by a registrant on his personal appearance before the board is the same as the written evidence contained in his file, it is difficult to see how it could be said that the record on appeal, which consists of written evidence and which is composed of the registrant's complete file, does not contain the evidence presented before the local board, and how a registrant could, in such a case, be deprived of a fair hearing on his appeal through failure of the local board to summarize the same information that already appears in written form in his file. It would seem that in this case, appellants would have no cause for complaining that the local board did not summarize in writing the information which they orally presented if that same evidence appeared in extenso in writing in appellants' complete file which was reviewed by the appeal board." Niznik v. United States, supra, 173 F.2d at page 333.

fact to be determined by the trier of facts at the trial.[4]

It will be noted that all that the regulation requires is that the oral information shall be "summarized" in writing. This of course means substantially less than a verbatim report of what the registrant said. The word "summarize" is defined as "to tell in, or reduce to, a summary; present briefly". "Summary" is defined as "an abstract, abridgment or compendium; esp. one recapitulating the sum or substance of a preceding discourse; as, he then proceeded to give a brief *summary* of the points he had covered."

It should be noted also that the clerk of the board who testified at the trial was interrogated with respect to the board's purported summary which we have previously quoted. She testified as follows:

"Q. I show you Government Exhibit Number 4 and ask you to tell us by whom that was prepared? A. That was prepared by me.

"Q. Upon the occasion of the personal appearance? A. That's right.

"Q. And what is it? A. You mean I should explain.

"Q. Yes. I would like to hear from you. A. Well, these are the minutes of the personal appearance.

"Q. That's the memorandum that you made at the direction of the Board? A. That's right.

"Q. Something showing what took place, is that right? A. That's right."

The substance of this testimony is that the exhibit there referred to, which is the summary, showed what actually took place. It might therefore well be held that the court properly found as a fact, on the basis of the clerk's testimony thus quoted, that what was there written reflected what was said at the time of appellant's appearance before the board. We think, however, that whether the statement was or was not "summarized", it cannot be said that the appellant was denied any substantial right, for the reason that the matter of his classification was subsequently considered by both the regular appeal board and the national appeal board.

The record shows that prior to the final consideration of the registrant's appeals, his file contained statements in writing which set forth all of the information which appellant claims to have given to the local board at the time of his personal appearance. On September 21, 1950, the appellant sent to the local board a lengthy statement in writing, largely argumentative but repeating his claim that he was a minister of a recognized religious organization who preached as his regular occupation and not merely occasionally or incidentally. This statement was available as well as the written statement of affiant Easter when the appeal board classified him on February 19, 1951. On February 28, 1951, in connection with his request for appeal before the national appeal board, appellant addressed a letter to General Hershey, Director of National Selective Service, in which he set out at length his claim as to his occupation, with a review of his local board record including a very complete statement of the additional information he says was furnished to the local board at the time of his personal appearance.

In those cases which have dealt with a failure of the local board to summarize the registrant's oral evidence, that failure has been considered important because of the resultant unavailability of those facts to the appeal board. Such is not the situation here. As this court pointed out in Cramer v. France, 9 Cir., 148 F.2d 801, 805, when

4. "While it clearly appears to us from the record that appellants introduced no 'further' oral information, which was not summarized in writing by the board on their hearing, in addition to what already appeared in writing in their files, it is to be remarked that in cases in which this becomes an issue, and where there may be any doubt on the point, undoubtedly the trial court would submit the question to the jury to determine, as a matter of fact, whether a registrant did offer such further oral information in addition to what already appeared in his file; and where there is a conflict in the testimony or evidence on the point, the question must be submitted to the jury for determination." Niznik v. United States, supra, 173 F.2d at page 334.

dealing with similar regulations, "the action of the board of appeals completely supersedes the action of the local board in classifying appellant, although the classification is the same." Such, we think, must be said of the action of the National Selective Service Appeal Board in this case.

In the case last cited there was a total failure of the local board to make or file any summary or registrant's oral evidence. It appeared, however, that the appellant himself had filed a long statement of the facts he claimed to warrant his classification and on which he was orally examined by the local board. This court said: "Though there is no summary of this examination by the Board, the question is whether appellant has shown, as required by section 627.13 of the regulations, that there are any facts stated in the oral examination 'which do not appear in the written information in the file' of appellant. Appellant has shown no such facts and hence has not shown that any summary was required of the local board." We followed that case in Tyrrell v. United States, 9 Cir., 200 F.2d 8. Cf. Knox v. United States, 9 Cir., 200 F.2d 398, 401. We think that an application of the principles expressed in the Cramer and Tyrrell cases, and in the Niznik case, supra, requires us to hold that in the circumstances here the appellant is not in a position to claim prejudice even if a summary were wholly lacking. But in view of the quoted testimony of the board's clerk, and in the light of the presence of the Easter affidavit, the court was justified in finding as a fact that the summary as filed met the requirements of the regulation.

We now proceed to a discussion of the contention that the draft boards had no basis in fact for the denial of the appellant's claim for exemption as a minister of religion and that their action in classifying him in Class I-A was arbitrary and capricious.

The present Act, like the Act construed in the decisions to which we shall presently refer, provides that the decisions of the local board "shall be final, except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe." Title 50 U.S.C.A. Appendix, § 460(b)(3). We must note at the outset that in dealing with this and the other provisions of the earlier Act, the Supreme Court said in Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 427, 90 L.Ed. 567: "The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant." Thereafter, in Cox v. United States, 332 U.S. 442, 453, 68 S.Ct. 115, 120, 92 L.Ed. 59, it was said: "Although we held in Estep that Congress did not intend to cut off all judicial review of a selective service order, petitioners have full protection by having the issue submitted to the trial judge and the reviewing courts to determine whether there was any substantial basis for the classification order. When the judge determines that there was a basis in fact to support classification, the issue need not and should not be submitted to the jury. Perhaps a court or jury would reach a different result from the evidence but as the determination of classification is for selective service, its order is reviewable 'only if there is no basis in fact for the classification.' Estep v. United States, supra, 327 U.S. page 122, 66 S.Ct. 427, 90 L.Ed. 567. Consequently when a court finds a basis in the file for the board's action that action is conclusive."[5] And in the case cited with,

5. Counsel for appellant questions the soundness of this case arguing that the opinion of Mr. Justice Reed from which this quotation is taken, was that of four justices only, while four members of the court dissented and Mr. Justice Frankfurter merely concurred in the result. We think it is fair to assume that Mr. Justice Frankfurter's attitude was the same as that expressed by him in,

approval in the Estep case, Goff v. United States, 4 Cir., 135 F.2d 610, 612, the court said: "[T]his does not mean that the court in a criminal proceeding may review the action of the board. That action is to be taken as final, notwithstanding errors of fact or law, so long as the board's jurisdiction is not transcended and its action is not so arbitrary and unreasonable as to amount to a denial of constitutional right."

The inquiry before the district court, and here, is not whether the court would reach a different result from the evidence which was before the draft board. Though the board's decision may be thought to be erroneous, it is not void unless there is no basis in fact for the classification. When we place ourselves in the position of the draft board and consider that which confronted it, we find at once that it may well have had some reasonable doubts as to' the status of this appellant. At the outset he put the board on notice that in his language the word "minister" meant something quite different from the ordinary conception of that term. At the trial he testified that he told the board that every member of Jehovah's Witnesses is a minister and entitled to exemption as such. This is evi-

dently a standard assertion of members of this sect, for the courts have had frequent occasion to allude to it. See the cases cited in Martin v. United States, 4 Cir., 190 F.2d 775, 777.[6] He also testified that he told the local board at his personal appearance that he was an ordained minister of religion.[7] But here again the appellant disclosed that to a Jehovah's Witness "ordination" has a special meaning. Referring to his conversation with the chairman of the board during his personal appearance, he testified: "I explained to him that unlike the organizations that he may have been familiar with, to Jehovah's Witnesses ordination is in the ceremony of baptism. It is not—baptism is not, to one of the Jehovah's Witnesses, a mere profession of faith, but it is his commission or ordination—the words are synonymous—to go forth and preach to others and teach the things that He Himself cherishes so much." Such an approach to the board required that it give appellant's claims rather careful scrutiny. Here was appellant, saying in substance: when a Jehovah's Witness is baptized as such he is ordained, and since every Jehovah's Witness is a minister of religion, the moment he is baptized he is an ordained minister of

the first portion of his concurring opinion in the Estep case, in which he expressed the view that the word "final" in the section providing that the decision of the local board should be final, was even more "final" and less subject to judicial review than the majority of the court then held. We think that the separate concurrence of Mr. Justice Frankfurter can give no comfort to appellant.

**6.** In Rase v. United States, 6 Cir., 129 F.2d 204, 209, the court referred to this matter as follows: "If we understand the appellant's argument, every member of his sect is a minister of religion and so entitled to exemption. No differentiation is to be recognized between shepherd and flock or between pastor and congregants. Followed to its logical conclusion, this would mean that all of the members of any religious group which imposes upon its adherents an obligation to teach and preach its beliefs or to make converts, are exempted under the Selective Service Act without regard to whether such activity constitutes their sole or principal vocation. It is inconceivable that it was the intention of the

Congress to incorporate in the Act an exemption so broad and all-embracing. The statutory exemption must be applied in consonance with the clearly apparent purpose of the Congress, and not in response to the interpretation placed upon it by particular religious groups or their adherents."

**7.** § 16 of the Act defines this term as follows: "(g) (1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization." 50 U.S.C.A.Appendix, § 466 (g) (1).

344

religion. Such an exposition of what constitutes an ordained minister of religion could call for nothing but skepticism.

Furthermore, we think that the draft board might reasonably weigh the statements made by the appellant by another standard which courts have approved, namely, that if weaker and less satisfactory evidence is produced by one who might have furnished stronger and more satisfactory proof, that which he presents should be viewed with distrust. Southern Pac. Co. v. Libbey, 9 Cir., 199 F.2d 341, 346, note 6. It must have seemed strange to the local board that the only documentary evidence of appellant's capacity as a minister which he brought forward was the affidavit of C. David Easter who described himself as a duly ordained minister working in a certain section of San Francisco.[8] The appellant obviously belonged to an organized religious society which in the nature of the case must have had some governing official body, corresponding to a synod, bishopric, or convention. An interesting inquiry for the board was why did not this governing body come forward with a credible certificate as to appellant's standing as a minister? We know judicially that as a part of the administration of the 1940 Act and during the second world war, in order to resolve the confusion which resulted from the claim that all Jehovah's Witnesses were ministers of religion authoritative lists were obtained from the heads of that society and furnished to the draft boards indicating which members of this group were recognized by the sect or organization as regular or ordained ministers.[9] While those lists were

not available under the present Act, we cannot assume that if this appellant was what he claimed to be he could not secure from the appropriate head or heads of his sect or organization similar evidence of his standing.

A minister of religion within the meaning of the Act does not include one who merely casts himself in that role. He must either be a "duly ordained minister of religion", or a "regular minister of religion". The definition of the latter term includes the statement that he must be one "who is recognized by such church, sect, or organization as a regular minister."[10] We think that the board was justified in being dissatisfied with the character of the showing which the appellant undertook to make that he was "recognized by such church, sect, or organization, as a regular minister", and in view of the appellant's unconventional notion of what constitutes ordination, the board was justified in refusing to accept his claim that he was an "ordained" minister of religion, as it was made clear to them that appellant did not use that term in its ordinary sense.

The provision of the regulations for a personal appearance of the registrant before the board serves the purpose not only of permitting the registrant to have his say, but of permitting the board to have a look at the registrant and to observe his manner, his appearance, and his demeanor. The great advantage which trial courts have in evaluating the testimony of witnesses through this opportunity for observation is constantly emphasized by appellate courts. This draft board had a similar advantage

8. The letter which appellant says he produced for the inspection of the board, as the letter which appointed him a minister, was marked and offered as an exhibit, but not admitted on the ground he had not left it with the board. It is apparently a form letter, printed on both sides of a paper bearing the letterhead of Watchtower Bible and Tract Society. The only signature is that Society's name, printed in script. Appellant's name before the salutation "Dear fellow Witness", appears to have been placed there by an addressograph.

9. Such lists are referred to in the Cox

case, supra, 332 U.S. at page 450, 68 S. Ct. at page 118.

10. Sec. 16. "When used in this title— * * * (g) * * * (2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister." Tit. 50 U.S.C.A.Appendix, § 466(g) (2).

which neither we nor the district court may disregard. Thus at the time he was making this statement he was not yet 21 years of age. He was then asserting that more than a year previously and at a time when he was 19 years of age, he had become a full time, ordained, recognized minister of religion. We cannot say that his looks and manner were not such as to emphasize this immaturity and the suggestion of absurdity in this claim.

The local board knew that when appellant made out his original questionnaire he was regularly employed at the navy yard; they knew that after they had classified him in Class I–A he stated that he had given up his job with the navy and had then become a full-time minister of religion. To a conscientious board, such claimed changes of circumstances following a I–A classification would require an inquiry whether they were real or feigned merely to improve his chances of proving his claim.[11] If he left the navy, was he still working as a radio repairman, and fully supporting himself thereby? As he had no salary or other income from the Jehovah's Witnesses he told the board that he supported himself by working part time as a radio repair man and that from this source he earned on an average $35 per month. It is apparent from appellant's own testimony in the court below that the members of the draft board were not inclined to believe this statement that this is all he earned, or that he could live on that amount.[12]

Even if we were of the opinion that the finding of the local board was clearly erroneous, and that it should have classified appellant as a minister of religion, we cannot on that basis alone hold the action of the draft board to be illegal, and the same limitations apply to the district court. In view of the circumstances to which we have here alluded, it cannot be said that the board's action was so arbitrary and capricious, so wanting in substantial basis, that the board was acting without jurisdiction. Surely a part of the board's duty, and a part of its jurisdiction, involved using its common sense in deciding whether such a claim as this was worthy of belief.

We cannot subscribe to any proposition that a draft board must give complete credence to all of the claims of such a registrant. The board had the same right to evaluate the testimony of a witness before it as has a trial court. Of that it was recently stated in Dyer v. MacDougall, 2 Cir., 201 F.2d 265, 269: "Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." We think that it cannot be said that there was not a "basis in fact to support the classification" made by the local board.[13]

This case presents no circumstance disclosing any bias, prejudice or unreasonable conduct on the part of the draft board. The appellant testified at the trial that at his appearance before the board he was treated reasonably and with respect, and he made no claim of failure to obtain a complete hearing there.

11. "As he made claim of conscientious objector classification only after he was reclassified I–A from IV–F and still later claimed ministerial exemption, the board was justified in deciding from the available facts that Cox had not established his ministerial status." Cox v. United States, supra, 332 U.S. 451, 68 S.Ct. 119.

12. During his cross-examination upon this phase of the case he testified: 'Q. And were you dressed just as nicely as you are now? A. Yes." Of course the trial court saw how this young man was dressed, and so did the board.

13. "When the judge determines that there was a basis in fact to support classification, the issue need not and should not be submitted to the jury." Cox v. United States, supra, 332 U.S. at page 453, 68 S.Ct. at page 120. "The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant." Estep v. United States, supra, 327 U.S. at page 122, 66 S.Ct. at page 427.

We have found that without regard to whether the decision of the local board may or may not have been erroneous there was yet substantial basis for its action.

The judgment must be affirmed.