**UNITED STATES ex rel. HULL v. STALTER.**

**No. 8869.**

Circuit Court of Appeals, Seventh Circuit.

Nov. 6, 1945.

Alexander M. Campbell, U. S. Atty., of Fort Wayne, Ind., James E. Keating, Asst. U. S. Atty., of South Bend, Ind., and Nathan T. Elliff, Sp. Asst. to the Atty. Gen., for appellant.

Hayden C. Covington, of Brooklyn, N. Y., and Victor F. Schmidt, of Rossmoyne, Ohio, for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This action was instituted by a petition for writ of habeas corpus to obtain the release of relator (Floyd Eugene Hull) from Civilian Public Service Camp No. 28, Medaryville, Ind. He alleged that he was illegally restrained of his liberty by reason of an order issued by Local Board No. 2 for Perry County, at Somerset, Ohio, dated February 8, 1944, commanding him to report to said camp for work of national importance. Relator alleged that at the time of his registration and at the time of his final classification, the proof submitted by him to the Selective Service System showed that he was exempt as a minister of religion under § 5(d) of the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 305(d), in that he was a duly ordained minister of Jehovah's Witnesses and the Watchtower Bible and Tract Society, constituting a recognized religious organization under the Act. Among other things, he alleged that the Board denied his claim for exemption from all training and service as a minister of religion because of arbitrariness, unfairness, capriciousness, usurpation of authority and by illegal action. In support of this charge of illegal action on the part of the Board, relator set forth a detailed history of his case before the Selective Service System. The material allegations of the petition were put in issue by respondent's answer. A trial was had, after which the court, on February 9, 1945, entered judgment discharging the relator from custody. We are now confronted with an appeal from this judgment.

While numerous questions are presented and discussed, we are of the view that the essential issue is whether the record made before the Board justified its refusal to classify relator in 4—D, as a minister of religion exempt under § 5(d) of the Act from training and service. Certain questions are raised which have a direct bearing upon this issue and which we think should first be disposed of. The trial court heard a number of witnesses concerning relator's activities from the date of his registration down to the trial, evidently offered for the purpose of showing that the refusal of the Board to classify him as a minister was erroneous. This was in addition, of course, to the documentary evidence which appeared in the Board's file. We think this proof was improperly heard. It must be remembered that the sole question decided by the Selective Service System was that of relator's classification. That issue was determinable both by the Local Board and the Board of Appeal from the evidence contained in relator's file. It is our view that the court could not properly consider evidence other than that which was considered by the Selective Service System.

Relator cites cases as authority for the action of the court in hearing this testimony but none of them are in point. Furthermore, we know of no authority in a proceeding of this kind which justifies the admission of any proof except that which was considered by the agency charged with the responsibility of making the original determination. However, this oral testimony as offered by relator and heard by the court was without objection. We therefore think its erroneous admission was waived. Furthermore, inasmuch as this was a trial by the court without a jury, we think that we may with propriety ignore such evidence and de-

cide the essential question from the documentary proof.

■ There is another question which under some circumstances might be of considerable moment, that is, whether relator's classification should be determined according to his status at the time of his registration or at the time of his final classification. The record before us, however, leaves little room for any contention in this respect. The court in its opinion stated:

"In the argument of counsel at the conclusion of the hearing it was conceded by the government that each registrant is entitled to be classified as of the time the classification is made rather than as of the time he registers, or, for that matter, as of any other time." The government here contends that this statement by the court was erroneous, relying on an inquiry directed by the court to a member of the Indiana Selective Service System and the latter's response thereto. We agree that this response furnishes meager, if any, support for the court's statement. However, the record also discloses that the case, at the conclusion of the testimony, was argued by counsel for both sides and this argument, or the greater portion thereof, is omitted from the transcript. Under such circumstances, we are unable to say that the court's statement is incorrect; in fact, we think that we must accept it.

■ Moreover, we have read the regulations and are of the view that this purported concession on the part of the government was correct. We see no reason why a registrant with a nonexempt status at the time of registration should not subsequently be permitted to show that his status has changed or, conversely, why one who is exempt at the time of registration should not afterwards be shown to be nonexempt. In fact, the latter situation seems to be contemplated by § 5(h) of the Act, which provides that "no * * * exemption or deferment * * * shall continue after the cause therefor ceases to exist." The point perhaps is better illustrated by referring to certain officials who are deferred from military service while holding office. Suppose a registrant who held no office at the time of his registration and was therefore liable for military service should subsequently be elected or appointed judge of a court or to any other office mentioned in the Act. We

suppose it would not be seriously contended but that he would be permitted to show his changed status any time prior to his induction into service and therefore be entitled to deferment. And we see no reason why a registrant claiming to be exempt as a minister should not be classified according to his status at the time of his final classification rather than that at the time of registration.

■ Whether there was any warrant in law for the Board's refusal to classify the relator as a minister involves a consideration of the facts as disclosed from its file. In doing so, no useful purpose can be served in reviewing or discussing the numerous cases wherein courts have attempted to determine the function of a court in this kind of case. To do so would merely demonstrate the contrariety of views which have been expressed. To our way of thinking, the rule has been aptly stated in United States ex rel. Trainin v. Cain, 2 Cir., 144 F.2d 944, 947:

"Thus it is error reviewable by the courts when it appears that the proceedings conducted by such boards 'have been without or in excess of their jurisdiction, or have been so manifestly unfair as to prevent a fair investigation, or that there has been a manifest abuse of the discretion with which they are invested under the act.' "

■ In the instant case, the attack on the Board's refusal to classify relator as a minister is reduced to the question as to whether the Board manifestly abused its discretion. If so, its action was arbitrary and capricious and hence in violation of due process. Such abuse of discretion, so we think, must be clearly demonstrated and cannot be held to exist if there is any rational basis upon which the Board's conclusion can be justified.

Relator registered under the Act with Local Board No. 2 for Perry County, Ohio, on July 1, 1941, and on February 3, 1943 (about nineteen months later), was finally classified as a conscientious objector, under class 4–E. During that time, relator repeatedly filed with the Local Board documentary evidence which disclosed that his entire time was devoted to performance of his duties as a minister of religion. Respondent places great stress upon the information contained in relator's questionnaire which was filed a few days subsequent to his registration. This disclosed that he was 21 years of

age, was a graduate of high school and that he was a minister of religion, customarily serving as a minister of Jehovah's Witnesses since November 1, 1935; that he had been ordained as such minister on September 19, 1937; that he was still attending a divinity school conducted by Jehovah's Witnesses at Kingdom Hall in Crooksville, Ohio; that he had been raised as a Jehovah's Witness and had been preaching in the vicinity of his home since 1935; that in preparing for the ministry he attended the ministerial school from two to three times each week; that he spent several hours each Sunday and one evening each week preaching to the people as a missionary evangelist from house to house and by conducting bible studies in homes; that he was an office clerk doing stenographic work for the A. ᴇ Hull Pottery Company, Crooksville, Ohio, earning approximately $26 per week.

He also stated in his questionnaire that he expected his job to end about September 1, 1941, and that he expected to start working as a full-time missionary evangelist under the direction of the Watchtower Bible and Tract Society on September 1, 1941; that such Society had assigned him to the missionary field in Minneapolis, Minnesota, where he would be required "to spend not less than 150 hours per month in his full time service for the Lord"; that the reason he engaged in secular work was to prepare himself for the full-time ministry and to sustain himself in his regular ministry part time, as did the Apostles of the Lord Jesus Christ, so as not to be a burden upon their brethren, which secular work was secondary to his primary purpose of preaching the gospel.

Submitted with his questionnaire was a letter from the Watchtower Bible and Tract Society showing his appointment as a full-time missionary evangelist as of September 1, 1941. It admonished him, among other things, that he must devote a minimum of 150 hours per month in preaching from door to door.

About September 1, 1941, relator was assigned to the missionary field in Minneapolis, Minnesota, and from that time on he devoted his full time to ministerial work. That such is the case was conclusively shown by affidavits submitted by numerous persons who had personal knowledge of the work in which relator was engaged up until the time of his induction. A statement of the contents of these numerous affidavits would unduly prolong this opinion. It is sufficient, so we think, to state that we have read and considered all the proof submitted and there is not a scintilla of evidence that relator from the time he went to Minnesota, about September 1, 1941, until the time of his induction was engaged in any work other than that performed in his ministerial capacity. Neither is there any room to doubt his honesty, sincerity and devotion to the cause which he represented. His parents before him were members of Jehovah's Witnesses, he was reared in the faith and from early childhood had an ambition to become a full-fledged minister.

The Board on September 18, 1941, placed the relator in class 1-A-O, as a conscientious objector available for non-combatant military service. This classification evidently was based largely, if not entirely, upon the information contained in relator's questionnaire. From the time it was made until the time of his induction, his classification was opposed by relator, and during all that time he contended that he was entitled to be classed as 4-D, a minister of religion. The Board on November 21, 1941, was advised by the State Headquarters, in response to an inquiry, that relator's name did not appear on the certified list. On December 10, 1941, the Board of Appeal classified relator in class 1-A-O. Shortly thereafter, the National Headquarters of the Selective Service System requested of the Local Board information as to whether or not relator was "at the present time employed in any secular occupation or if he appears to devote all his time to the work of Jehovah's Witnesses." In response to this letter, the Board on January 12, 1942, advised the National Headquarters as to the secular work performed by relator prior to the time of the filing of his questionnaire. The letter contained no information, however, as to the work in which relator was engaged at the time it was written, which was the information requested by the National Headquarters. The Board in this letter also stated its derogatory opinion of Jehovah's Witnesses in general and intimated that their claims for exemption or deferment were merely for the purpose of evading military service.

.

On March 26, 1942, the Local Board, in compliance with the ruling of the Board of Appeal, reclassified relator, placing him in class 1–A–O. On April 9, 1942, he was ordered to report for induction into the armed forces for limited service. For failure to comply with the order, he was reported to the United States Attorney in Ohio as a delinquent. His case was referred to the Department of Justice who advised the United States Attorney that in view of the additional evidence submitted by relator, his case should again be referred to the Board of Appeal and that, as the file existed at that time, no prosecution could be had. The file was returned to the Board of Appeal which on June 3, 1942, classified relator in 4–D, as a minister of religion. The State Director suggested to the Board of Appeal that it was without jurisdiction to classify relator for the reason that he was delinquent. The Board of Appeal, acting upon such suggestion, cancelled relator's 4–D classification. Again, on August 21, 1942, relator's file was returned to the Board of Appeal on the recommendation of an Assistant Attorney General of the United States. On that occasion, the Board of Appeal found that relator should not be classified in 4–D or any other classification which deferred or exempted him.

Thereupon, his case was referred to the Department of Justice, Federal Bureau of Investigation, for an inquiry into the background, sincerity and status of relator as a conscientious objector. This investigation proceeded from August 25 to December 4, 1942. A report was filed with the Board of Appeal on or about February 3, 1943. This report discloses the result of the investigation and concludes: "This man is a sincere believer in his faith and has a very fine personal record." During the time his case was being investigated by the F. B. I., relator submitted numerous additional affidavits which showed that he was actively engaged in ministerial work. On June 27, 1942, the Board forwarded to relator an occupational questionnaire. In response thereto, he again informed the Board in detail the character of his ministerial work and again requested of the Board that he be classified as 4–D. All this additional evidence was submitted to the Board and placed in its file. Duplicate copies were forwarded to the State Headquarters of the Selective Service System.

On February 3, 1943, relator was finally classified by the Board of Appeal in class 4–E, a conscientious objector available for work of national importance. On April 27, 1943, relator notified the draft board that his field of ministerial activity had been changed from Minnesota to Lawrenceburg, Ind., where he was still performing his duties as a full-time missionary evangelist. Shortly thereafter his case was referred to the Dearborn County Local Board No. 1, Lawrenceburg, Ind., for processing upon his assignment to do work of national importance. That Board reviewed the facts of the case and in a letter to the State Selective Service System of Indiana dated July 22, 1943, expressed the opinion that relator was not a draft evader and that he was entitled to a 4–D classification and suggested that fairness required that an investigation be made to determine why he had not been so classified.

Relator was ordered to report on August 9, 1943, to do work of national importance. Failing to report, his case was submitted to the District Attorney of Indiana, who refused to prosecute and in a letter to the Lawrenceburg Board suggested that it refuse to take any further action against the registrant because of their belief that "registrant is entitled to a 4–D classification." He suggested that the case be returned to the Ohio Board, which was done. That Board ordered him to report for induction, and on September 28, 1944, he arrived at the camp, where he remained until discharged in the instant proceeding.

Much is said in the briefs both complimentary and derogatory to Jehovah's Witnesses. With this argument we are not concerned. Whatever a draft board or a court, or anybody else for that matter, may think of them is of little consequence. The fact is, they have been recognized by the Selective Service System as a religious organization and are entitled to the same treatment as the members of any other religious organization. We do not agree with relator's argument that all members of the organization are ministers and exempt from military service. Neither do we agree with the government's argument that the activities and doings of all the members of the organization may be taken into consideration in determining whether a particular member is entitled to exemption. In our view, every

registrant, whether he be Jehovah's Witness or otherwise, is entitled to have his status determined according to the facts of his individual case. Also, a registrant's classification should be determined by the realities of the situation, not merely by what he professes. A registrant is not entitled to exemption merely because he professes to be a minister, but he is entitled to such exemption if his work brings him within that classification.

Selective Service Regulations (622.44) recognize two classes of ministers, (1) a regular minister of religion, and (2) a duly ordained minister of religion. The former "is a man who customarily preaches and teaches the principles of religion of a recognized charge, religious sect, or religious organization of which he is a member * * *." The latter "is a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church * * *." The Selective Service System has even more broadly defined the term "regular minister of religion." Under the heading, "Special Problems of Classification" (Selective Service in Wartime, Second Report of the Director of Selective Service, 1941-42, pages 239-241), it is stated:

"The ordinary concept of 'preaching and teaching' is that it must be oral and from the pulpit or platform. Such is not the test. Preaching and teaching have neither locational nor vocal limitations. The method of transmission of knowledge does not determine its value or effect its purpose or goal. One may preach or teach from the pulpit, from the curbstone, in the fields, or at the residential fronts. He may shout his message 'from housetops' or write it 'upon tablets of stone'. He may give his 'sermon on the mount', heal the eyes of the blind, write upon the sands while a Magdalene kneels, wash disciples' feet or die upon the cross. * * * He may walk the streets in daily converse with those about him telling them of those ideals that are the foundation of his religious conviction, or he may transmit his message on the written or printed page, but he is none the less minister of religion if such method has been adopted by him as the effective means of inculcating in the minds and hearts of men the principles of religion. * * * To be a 'regular minister' of religion the translation of religious principles into the lives of his fellows must be the dominating factor in his own life, and must have that continuity of purpose and action that renders other purposes and actions relatively unimportant."

█ A study of this record leaves no room for doubt but that relator, at the time of his final classification and for many months prior thereto, was a full-time minister within the meaning of the regulation and this pronouncement of the Selective Service System. He was not performing secular work of any kind or character. There is not a scintilla of proof which impugns his honesty, good faith or devotion to the cause. Respondent makes no criticism of relator in this respect. Neither has the Selective Service System of Ohio done so insofar as relator is individually concerned. Such criticism as is disclosed by the record was directed entirely at Jehovah's Witnesses as a class.

In our view, there are only two circumstances which could at any time have furnished the slightest justification for the Board's refusal to classify relator as a minister, (1) information contained in his questionnaire and (2) the fact that he was not registered with the National Headquarters of the Selective Service System as a minister. True, his questionnaire disclosed that he was not a full-time minister, part of his time being devoted to secular occupations. The questionnaire, however, also disclosed that commencing September 1, 1941, he expected to cease his secular activities and devote all of his time to ministerial work. That his intention in this respect was fully performed is not open to dispute. There is not a scintilla of evidence upon which a contrary conclusion or even a reasonable inference could be predicated. The fact that his name was not included as a minister of Jehovah's Witnesses at National Headquarters of the Selective Service is of little or no consequence under the facts of the case. While it perhaps was a circumstance to be considered by the Board, it constituted no proof as to relator's actual status. Furthermore, the practice of placing names upon this list was discontinued by the National Director of Selective Service on November 2, 1942 (relator was finally classified February 3, 1943). We have serious doubt that there was any justification for the Board's refusal originally to classify relator in 4-D. Whatever be thought, however, of the

Board's original action in this respect, there can be no question but' that subsequent proof conclusively demonstrated that he was entitled to such classification.

Such being the situation, the Board abused its discretion in its refusal to so classify him. Its action was arbitrary and unauthorized. The order discharging relator is affirmed.