### NEAL v. UNITED STATES.
No. 13970.

United States Court of Appeals
Fifth Circuit.

March 26, 1953.

Writ of Certiorari Denied June 15, 1953.

See 73 S.Ct. 1138.

Hayden C. Covington, Brooklyn, N. Y., Tom S. Williams, San Antonio, Tex., for appellant.

Wm. H. Russell, Asst. U. S. Atty., Chas. F. Herring, U. S. Atty., and Bradford F. Miller, Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before HOLMES, RUSSELL and STRUM, Circuit Judges.

STRUM, Circuit Judge.

Appellant was convicted below of refusing to submit to induction into the Armed Forces of the United States under the Selective Service Act of 1948, 50 U.S. C.A.Appendix, §§ 451–470. He contends here that the administrative proceedings upon which his induction is based are void because he was not accorded a personal hearing by his local draft board before classifying him I-A, and that the action of the draft boards, local and appellate, in so classifying him, and in refusing to reopen his case, was arbitrary, capricious, and without basis in fact, for which reasons, and others to be hereafter mentioned, appellant asserts that he has been denied due process, and that the judgment of conviction should be reversed.

Appellant is a member of Jehovah's Witnesses. On his questionnaire, filed August 10, 1949, he sought a I-A-O classification as a conscientious objector and also a class IV-D classification as a minister of the gospel. On August 22, 1950, appellant was classified I-A-O. He appealed, claiming that he should be classified IV-D as an ordained minister. The Texas board of appeal tentatively denied the classification as a minister on September 15, 1950, and referred the file to the Department of Justice for investigation as to appellant's claim for classification as a conscientious objector, which is standard routine procedure in such cases. See 50 U.S.C.A.Appendix, § 456(j) and 32 Code of Fed.Reg., sec. 1626.25(c).

During the investigation, a Federal Bureau of Investigation agent secured from appellant a written statement waiving appellant's claim as a conscientious objector, and stating that he stood solely upon his claim of exemption as a minister. After considering the report and waiver, the local board on December 6, 1950, reopened the case and by a vote of 4-0 classified appellant I-A, available for military service. The Texas state appeal board approved that classification January 12, 1951, by a vote of 5-0, and the national appeal board, by a vote of 3-0, approved it on July 11, 1951. Appellant appeared before the state appeal board on February 15, 1951. That board reviewed the case at that time, but refused to reopen it.

After the appeal board classified him as I-A, appellant communicated with the Director of Selective Service, pursuant to whose suggestion the local board at Houston, with which appellant was registered, granted appellant a personal appearance and hearing at Houston on March 7, 1951, to consider whether or not the board would again reopen appellant's case for further consideration. As a result of that hearing it was determined not to reopen the case,

and appellant was ordered to report for induction March 12, 1951. Appellant's refusal to comply is the basis of his indictment.

There is conflict in the evidence as to what transpired when the F. B. I. agent interviewed appellant at his home on November 2, 1950, as to whether he claimed classification as a conscientious objector, or as a minister. Appellant testified in effect that the agent brought with him a prepared statement for appellant to sign, waiving his claim as a conscientious objector, assured appellant that he was his friend, and told him "You can't rely on both of these grounds; you must take one or the other." Also, that if appellant relied on being a conscientious objector he was subject to being drafted, but if he withdrew his claim and stood upon his ministerial status, he would be exempt. Appellant says that he relied upon and was deceived by these representations, and was thus improperly persuaded to waive his conscientious objector claim.

The agent, on the other hand, testified that he visited appellant in the course of a routine investigation to determine whether appellant was relying on his claim to classification as a conscientious objector, or upon his claim to exemption as a minister, which was not clear from the information previously furnished. He denied making the statements attributed to him by appellant, denied that he practiced any persuasion upon appellant, or that he suggested to him that he waive his claim as a conscientious objector, although the agent admitted that he had with him a prepared statement waiving the conscientious objector claim, which appellant later signed, and which was prepared in advance because the agent understood from information previously furnished him that appellant probably wished to stand on his claim as a minister rather than on his claim as a conscientious objector.

■ This conflict presents solely a question of credibility to be resolved by the trial judge, before whom the case was on trial without a jury. The judge accepted the agent's testimony as true, and resolved the conflict against appellant. There is ample support in the evidence for that action. We can not say that the trial judge was clearly in error in thus resolving the conflict. With the conflict thus resolved, appellant's claim that he was improperly induced to waive his conscientious objector classification is without support.

■ Appellant points out that the statute, 50 U.S.C.A.Appendix, § 456(j), and 32 Code of Fed.Reg., sec. 1626.25(c), mandatorily require that where a registrant claims to be a conscientious objector the matter shall be referred to the Department of Justice for investigation, and that that department shall hold a hearing thereon, of the time and place of which the registrant shall be notified, and that in this case no such hearing was held. When, however, as here, the claim of conscientious objector is waived by the registrant, the necessity for such a hearing is obviated. Of course, appellant claims that he did not understandingly waive that claim. But the trial judge found against him on that question on the facts. In his brief, appellant concedes that the F. B. I. agent followed the standard procedure prescribed by the Department of Justice, although he contends that the procedure "is illegal." We find in it, however, no such denial of due process as would render the administrative proceedings void.

The contention that appellant was denied a personal appearance before the local board originates with a letter dated December 12, 1950, written by appellant to the local board at Houston, appealing from his classification as I–A, on December 6, 1950, and asking for a personal appearance before the local board in Austin, Texas (to which city appellant had moved) in order to establish his status as a minister entitled to a IV–D classification. *There is no evidence that appellant requested, or was denied, a hearing prior to that time.*

Appellant was clearly not entitled to a hearing at Austin, as he was registered with the local board at Houston. The Austin board had no jurisdiction to hear him. Upon the suggestion of the Director of Selective Service, the Houston board, to which the letter of December 12, 1950, was

addressed, fixed a hearing for March 7, 1951, as already mentioned, to determine whether or not to reopen appellant's case and reconsider the I–A classification. Appellant had notice of that hearing, and attended it in person.

At the hearing of March 7, 1951, the board asked appellant eight questions dealing with his occupational and ministerial activities and training, and a ninth question, which was "Do you love America enough to fight for it?", to which appellant an-

swered "No." The impression gained by the court at the oral argument on appeal was that when appellant answered the ninth question as just stated, the Board became impatient with appellant, and in effect terminated the hearing. The record shows, however, at pages 54 to 59, that after the question was asked and answered, the board listened to appellant at length while he explained his religious views which he contended entitled him to a IV–D classification.[1]

1. "Q. And tell us what happened, if anything, following the statement that you have just read there out of that memorandum. Read that again. A. Do you love America enough to fight for it?

"Q. All right; then what happened, and what did you say if anything, in answer to that question? A. I told them that I loved America as the best form of Government in this present system of things, but being a minister of the Gospel and the Bible declaring that the Christian should be neutral towards the governments of the world, then I could not love America (enough) to fight for it, because it is contrary to the Scriptures; I told them that.

"Q. All right; what else did you tell them? A. I told them that the Bible definitely stated that all people who are going to gain life must put their following to Christ Jesus, and I told them since I am a follower of Christ Jesus that I too must be neutral towards the world, because the Bible says—I told them that the Bible says, John 18th Chapter, that Christ Jesus' Kingdom is not in this world, and since his Kingdom is not of this world, then his servants should be neutral.

"Q. And what else did you say? A. I told them that the Kingdom, that Christ Jesus said, that is not of this world is the Kingdom that is established in Heaven under Christ Jesus, and that he is the head of this Kingdom, and that all of the Christians look forward to the Kingdom as being man's only hope, and so I being a minister I was advocating that Kingdom and recommending this Kingdom to all people who would like to live forever in the new world, and then I told them that in this new world there would be no sickness nor death or wars, or things that cause people to suffer, but that all people will enjoy peace and happiness, not living in fear of one another, whether they are going to come take their land, their home, or their property, and so

forth, and then I told them that the Bible says in the Book of Micah that every man should sit in his vineyard and under his fig tree and that none should make them afraid. Of course, then I told them that this would not be accomplished by no men, but that this would be accomplished by Jehovah God. And then I began to tell them some other things. I told them that as ambassador, the Apostle Paul told Timothy—(* * * Colloquy between court and counsel.)

"Q. Now, go ahead and tell us what else you told that local board about your ministerial status and how you preached and the number of hours and the secular work you did and all that sort of thing. A. I told them that the Apostle Paul admonished Timothy being a soldier of Christ that he could not entangle himself with the affairs of this world, and then I told them that that (sic) being a minister of the gospel and being neutral in this world that I put in three hundred hours a month in preaching and that that is more than many of the 'religious' clergymen devote to their congregation and go to their congregations and preach on Sundays do. Of course, *after finishing telling them about this*, (Emphasis supplied) then the members of the draft board says, 'We do not even want to talk with you any more. We are going to put you in class I–A,' and then one of the draft members asked the clerk, one of the clerks there, 'When are you going to induct him,' and then the clerk told him, 'A date in the very near future,' and then one of the draft board men said, 'That's good. We don't want to talk to him any more.'

"Q. And were you prepared to show that draft board that your secular work in no way prevented you from putting your 300 hours a month in your ministerial work? A. Yes, I was.

"Q. And did you want to try to show them that? A. I wanted to.

"Q. And did you want to show them

Appellant contends that he desired, and was prepared, to show the board that he devoted 300 hours per month to ministerial work, that his secular work was "incidental to his main job of preaching," and that he was authorized to perform weddings, baptisms, and officiate at funerals. The record discloses that the board gave him ample opportunity to present these matters, but he used the time for other purposes, as shown in Note 1. Moreover, appellant himself testified that at the hearing of March 7, 1951, he told the board that " * * * I put in three hundred hours a month in preaching and that that is more than many of the 'religious clergymen' devote to their congregations and go to their congregations (sic) and preach on Sundays do." Record page 58.

■ The Selective Service regulations, 32 Code of Fed.Reg. 1624.2(b), afford a registrant the right to appear before the local draft board and discuss his classification, point out the class or classes in which he thinks he should be placed, and to direct attention to any information in his file which he believes the board has overlooked, or to which it has not given sufficient weight. While it is not the right of a registrant to prolong the hearing unreasonably, it is the duty of the board to hear his evidence and arguments fully, fairly and with reasonable patience, so that it may properly evaluate the facts on the merits.

■ What has already been shown in Note 1 demonstrates that the board accorded appellant a hearing which complies with the regulations, and which satisfies the requirements of due process, besides which appellant has had the attention and cooperation of the Texas State Selective Service headquarters at Austin, the National Director of Selective Service, and has had the benefit of two appeals to the state appeal board and a final appeal to the national appeal board, all of whom, without dissent, have decided against appellant's ministerial claims. We believe he has been adequately heard, and that the requirements of due process have been satisfied. Certainly it can not be said that the local board's refusal to reopen the case after all that had gone before, was an "arbitrary and capricious" denial of a hearing. Appellant concedes in his brief that at the hearing of March 7, 1951, he "explained fully (to the board) the reasons why he had conscientious objections to war." In his testimony shown in note 1, appellant states that it was only "after *finishing* telling them about this" that the board said they did not want to hear him any more. Appellant made no request for a hearing prior to his classification as I-A on December 6, 1950. His first request for a hearing was on December 12, 1950, to consider the reopening of his classification, which hearing was granted him on March 7, 1951.

Appellant further asserts that the draft boards, local and appellate, had no basis in fact for denying him a ministerial classification, but arbitrarily and capriciously classified him I-A. The facts upon which the boards acted were, in summary, that appellant claimed to have been baptised and ordained a minister in Jehovah's Witnesses on June 2, 1946, at the age of 18, after an informal course of instruction by other Jehovah's Witnesses covering a period of about two months. This was about two years before he registered with his local draft board, September 13, 1948. He became a full time "Pioneer" in the Watchtower Bible and Tract Society, August 1, 1948, about 1½ months before he registered under Selective Service. At that time he

---

that the secular work was altogether incidental to your main job of preaching that required 300 hours a month? A. Yes, I did.

"Q. And did you go there prepared to show them that you were authorized by your organization to preach sermons from the pulpit? A. Yes, sir, I did.

"Q. And did you go there prepared to show them that you were authorized to perform the ceremony of baptism and to bury people? A. Yes, sir, I did.

"Q. And did you have an opportunity to discuss that? A. No, sir; they did not want to discuss it any more.

"Q. They said they didn't want to hear you any more? A. Didn't want to hear me any more.

"Q. Then, of course, you left; is that correct? A. Yes, sir, that is correct."

was employed by a laundry as a porter and truck driver, cleaning up the building and picking up laundry at substations. When he filled out his questionnaire he was devoting about 36 hours per week (or about 162 hours per month) to his secular work and about 100 hours per month or more to his ministerial work. When he was classified I–A, his secular work had been reduced to about 20 hours per week (or about 90 hours per month) and his ministerial work increased to about 300 hours per month, which included his time spent in "studying." He claims that preaching was then his "main job."

Appellant was twice convicted of stealing, the last time when he was about 17 years of age, which was about one year prior to his ordination as a minister, for which offenses he was dealt with as a juvenile. When he filed his questionnaire, August 10, 1949, he was suffering from a loathsome social disease usually associated with immorality, but which he claimed he contracted from an unfaithful wife, from whom he was then seeking a divorce because of her adultery.

Appellant claimed that he was authorized by the Watchtower Bible & Tract Society to preach sermons from the pulpit, to perform marriages, and to officiate at funerals. But he had no church, no congregation, he received no compensation, and held no religious services at any particular place. His ministry consisted of passing out religious magazines published by Jehovah's Witnesses, preaching from house to house when not engaged in secular pursuits, and delivering Bible lectures at infrequent intervals.

 Jehovah's Witnesses have been recognized as a religious sect, and that its door-to-door evangelism is as much religious activity as worship in churches and preaching from pulpits. The fact that they perform secular duties does not of itself defeat a claim to ministerial status. See the dissenting opinion of Mr. Justice Douglas, joined by Mr. Justice Black, in Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59; United States ex rel. Hull v.

Stalter, 7 Cir., 151 F.2d 633. Compare also Murdock v. Com. of Pennsylvania, 319 U.S. 105, 63 S.Ct. 891, 87 L.Ed. 1292.

 Whether he is a Jehovah's Witness, or a member of another sect or denomination, a registrant's status as a minister should be determined according to the facts of his individual case, and according to the realities of the situation,—not merely by what he professes. If his work brings him within the ministerial classification, he is entitled to be so classified, but he is not entitled to that classification merely because he proclaims himself to be a minister, nor because the religious sect to which he belongs, designates all its members as "ministers." Buttecali v. United States, 5 Cir., 130 F.2d 172; United States ex rel. Hull v. Stalter, 7 Cir., 151 F.2d 633. The phrase "minister of religion" as used in the Selective Service Act must be interpreted according to the intention of Congress in adopting it, and not necessarily according to the meaning attributed to it by the members of any particular sect. Martin v. United States, 4 Cir., 190 F.2d 775.

 The power to determine a registrant's classification is confided to the local draft boards. 50 U.S.C.A.Appendix, § 460(b) (3). Of course the board can not act arbitrarily nor capriciously. It must exercise an informed discretion based upon the facts, and its powers must be exercised consistently with the requirements of due process. So long, however, as the board acts in accordance with law and the regulations, and consistently with due process, its determination is final, subject only to the right of administrative appeal. Courts do not review them for mere error. Judicial review is confined to the narrow question of jurisdiction. Cahoon v. United States, 5 Cir., 155 F.2d 150; United States ex rel. Trainin v. Cain, 2 Cir., 144 F.2d 944. Abuse of the board's discretion must be clearly shown before the courts will declare its action void as a denial of due process. If there is any rational basis of fact for the classification, the board's action will be sustained. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567;

Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59; United States ex rel. Hull v. Stalter, 7 Cir., 151 F.2d 633.

 The picture made by the foregoing facts presents ample basis for the exercise of informed discretion by the board. We are unwilling to hold, on these facts, that the board clearly acted arbitrarily and capriciously, so as to deprive appellant of due process, by denying his ministerial classification. Four members of the local board, on two occasions; five members of the state appeal board, on two occasions; and three members of the national appeal board, all without a dissent, have concurred in denying appellant a ministerial status. The local board, and the state appeal board, had the advantage of seeing and hearing appellant in person. It requires a much stronger showing than is made by this evidence to overthrow the unanimous judgment of all these boards, and to hold that they acted arbitrarily and capriciously, with no rational basis of fact. It is highly improbable that they are all prejudiced against appellant. Martin v. United States, 4 Cir., 190 F.2d 775; Rase v. United States, 6 Cir., 129 F.2d 204, 208–209; Buttecali v. United States, 5 Cir., 130 F.2d 172; Lemien v. United States, 5 Cir., 158 F.2d 550; Wells v. United States, 5 Cir., 158 F.2d 932; United States ex rel. Goodman v. Hearn, 5 Cir., 153 F.2d 186; United States ex rel. Yaroslawitz v. Fales, D.C.Fla., 61 F.Supp. 960. Compare Davis v. United States, 6 Cir., 199 F.2d 689, which follows the rule above stated, but holds the action of the board arbitrary in that instance.

Error is also assigned upon the refusal of the trial judge to require the United States to produce for inspection, and to transmit to this court, sealed, a written confidential report made by the F. B. I. agent to the Department of Justice relating to the securing from appellant of his waiver of claim as a conscientious objector, already discussed. We find no reversible error in that ruling. The written statement secured from appellant was already in evidence when the F. B. I. agent took the stand. No reference to the confidential report, nor to its contents, was made by the agent on direct examination. He simply testified as to what occurred. On cross-examination, however, appellant's counsel examined the agent at length as to the confidential report, and pressed him to state the contents of it, which he refused to do. Appellant then asked the court to require the production of the report, stating that it would aid his cross-examination, and might enable him to impeach the witness. The whole situation arose out of cross-examination of the agent by appellant.

 Whether or not the report should have been required in these circumstances was, at most, discretionary with the trial judge. We see no abuse, nor reversible error, in refusing to require the production of a confidential document upon the mere hope and expectation of the defendant that it might disclose something of benefit to him, when the United States had made no reference to the report, nor to its contents, on direct examination. If appellant is entitled to the report in these circumstances, then any confidential document could be secured upon the speculative assertion that it might help a defendant's cause. Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322; Kaufman v. United States, 6 Cir., 163 F.2d 404.

Other assignments have been examined, but no reversible error found.

Affirmed.