**UNITED STATES of America, Plaintiff,**

**v.**

**James Lamar HARPER, Defendant.**

**Cr. A. No. 1773–S.**

United States District Court
M. D. Alabama, S. D.

May 22, 1956.

Hartwell Davis, Montgomery, Ala., and Robert E. Varner, Montgomery, Ala., for plaintiff.

Victor V. Blackwell, Covington, La., for defendant.

JOHNSON, District Judge.

James Lamar Harper, a resident of Coffee County, Alabama, having been born in Coffee County, Alabama, on July 29, 1929, was indicted by the Federal Grand Jury for the Middle District of Alabama, on February 28, 1956, for violating certain sections of Title 50 U.S.C.A.Appendix as they relate to individuals failing and refusing to carry out the provisions of the Universal Military Training and Service Act. Specifically, Harper was charged with:

"On or about December 1954, in the Middle District of Alabama, James Lamar Harper, a person classified 1–O, under the Universal Military Training and Service Act, and charged as provided thereunder with the duty of carrying out the provisions of said Act and of the rules and regulations made and the directions given thereunder, to wit, the duty of reporting to Local Board No. 16, Elba, Alabama, for instructions to proceed to the place of employment, to wit, Alabama State Hospital, Tuscaloosa, Alabama, did wilfully and knowingly fail, neglect and refuse to report at said time and place".

On October 1, 1948, James Lamar Harper, the defendant in this case, filed with Local Board No. 16, Coffee County, Elba, Alabama, the classification questionnaire required of all registrants under the Universal Military Training and Service

Act. Harper, in addition to the general information, set out the fact that he was unmarried, worked as an "unpaid family worker" on the farm of his father, H. G. Harper, Route 1, New Brockton, Alabama; that he lived on this farm but was not actually responsible for the operation of the farm. He claimed, "Since January 1948, I have devoted my spare time (the time while not engaged in ministerial work) to work on the farm to help support aged parents." The size of the farm upon which the defendant worked at that time was, according to his classification questionnaire, approximately 17 acres in cultivation and the total value of the products sold from this farm during the year immediately preceding the time the questionnaire was filed was approximately $900. The defendant further claimed in his questionnaire that he was a minister of religion, served regularly as a minister of the Jehovah's Witnesses and had so served since September 30, 1939, at which time he claimed to have been formally ordained. It should be noted at this point that on September 30, 1939, when the defendant claimed to have been formally ordained as a minister of Jehovah's Witnesses, he was only 10 years of age. In addition, defendant claimed on the classification questionnaire he filed on October 1, 1948, to have been a conscientious objector to war. This man was given a ministerial classification by the local board on January 6, 1949. This defendant, at about this same time, filed with his local board a special form provided by the Selective Service System for conscientious objectors. In this conscientious objector's form he claimed to be a minister of Jehovah's Witnesses since September 30, 1939, and claimed to be assistant presiding minister of the local congregation of Jehovah's Witnesses. The form as completed by Harper reflected that his father, H. G. Harper (on whose farm defendant worked) was the presiding minister. The technical title for the defendant was Assistant Company Servant and the title of his father was Company Servant. At this time the

local board again classified defendant as a minister. On November 20, 1951, the local board for the Selective Service System reviewed the defendant's classification and changed his classification to I–O (conscientious objector). This classification was reviewed by the board at defendant's request (certain letters, affidavits, documents, and literature were filed by or on behalf of the defendant), including a personal appearance before the local board, and thereafter on January 9, 1952, the defendant was again classified as IV–D (ministerial classification).

It should be noted at this point that in December 1953, the defendant, at the request of his local board, completed the Agricultural Status Questionnaire. In the questionnaire, at that time, he claimed that he and his father owned the farm; that it consisted of 35 acres in cultivation, 10 acres in pasture, and 100 acres of woodland; that he was engaged in general farming with 20 acres of corn, 11 acres of peanuts, and 5 acres of truck crops; that he had cattle, hogs and poultry. The questionnaire as completed by Harper also reflected that $2,700 in farm products was sold from this farm for the year immediately preceding the time the questionnaire was filed. At that time the defendant claimed to be the general overseer of the farm and claimed that his removal from the farm would cause "complete suspension of farming operations." Defendant on the questionnaire also stated that his work on the farm was part time and that the other work he performed was ministerial work. On January 7, 1954, the local board reviewed this defendant's case at the request of the classification officer for the State Selective Service System and classified him I–A. Subsequent to this classification, the defendant again requested a personal appearance and filed further documentary evidence as to his ministerial duties and activities, and also filed affidavits completed by himself, together with certain literature purporting to be that of the Jehovah's Witnesses sect. On February 25, 1954, the defend-

ant was restricted in his personal appearance to a period of fifteen minutes and was by the local board refused the privilege of bringing witnesses before the board. He was, however, afforded the opportunity of presenting evidence by statements and affidavits. Subsequent to this hearing, the board classified him I–O on March 31, 1954, this being the conscientious objector classification. This, of course, made the defendant liable for civilian employment in lieu of military service under the Selective Service regulations. On April 13, 1954, the defendant advised that the classification of I–O made by the board on March 31, 1954, was to be appealed. His file was forwarded to the Appeal Board, and on July 13, 1954, the defendant was classified as I–O by the Appeal Board. During the period, various documents and affidavits were filed by and on behalf of the defendant relating to his ministerial activities.

A fair résumé of these documents is that the defendant had been ordained in accordance with the principles of the Watch Tower Bible and Tract Society; that he was a minister of Jehovah's Witnesses engaged in preaching and teaching the principles of the society and administering rites and ceremonies in public worship; that the defendant officiated and assisted the presiding minister of the New Brockton, Alabama, congregation of Jehovah's Witnesses (as assistant to his father who was the presiding minister). The defendant, in the evidence presented by and on his behalf, claimed that preaching and teaching was his "vocation" and farming was his "avocation." The defendant claimed to devote approximately 100 hours per month to ministerial duties. The defendant was mailed on or about November 19, 1954, an order to report for civilian work at a designated place, which was one of the approved places of work for conscientious objectors to perform civilian work in lieu of induction in the armed forces. He was ordered to report for this work on December 6, 1954. He failed and refused and continues to fail and refuse to report for this civilian work in lieu of induction.

The matter was presented to the Court on the basis of the Selective Service file and by stipulations executed by the defendant, his attorney, and the attorneys representing the Government. A jury was waived, and the facts stipulated, in addition to the Selective Service file, were:

"That, on or about December 6, 1954, in the Middle District of Alabama, the defendant, a person classified I–O under the Universal Military Service and Training Act, was ordered by his Local Board, Local Board No. 16, to report to said Board at Elba, Alabama, for instructions to proceed to the place of employment, to wit, Alabama State Hospital, Tuscaloosa, Alabama, and that he did fail, neglect and refuse to report at said time and place".

The defendant filed an argued before the Court a motion for judgment of acquittal, claiming the denial of his claim for exemption as a minister was without basis in fact, was capricious, prejudicial, and contrary to the law. In addition, he claimed that the local board in denying the ministerial classification did not follow the definition of the term "minister of religion" used in the Act and regulations; claimed, further, that the local board erroneously held that his performance of part-time secular work defeated his ministerial claim; claimed, further, that the reclassification from class IV–D, the ministerial classification he was given on January 9, 1952, and placing him in I–A on January 7, 1954, was without basis in fact, was arbitrary, and capricious. Defendant claimed, further, that the refusal of the local board to permit him to bring witnesses to personally testify before the board was arbitrary and capricious and an abuse of the discretionary administrative authority invested in the local board; claimed, further, that § 1624.2(c) of the Selective Service regulations denied to him the full, fair, and de novo hearing provided for under § 1624.2(b) of the regulations. In other

words, § 1624.2(c) procedurally destroys, abrogates, and nullifies the rights granted a registrant by § 1624.2(b) of the Selective Service regulations; claimed, further, that the various administrative agencies of the Selective Service System, in classifying him as a conscientious objector instead of a minister, violated that portion of the regulations requiring the board or agency to classify each registrant in the lowest class to which he is entitled.

Section 6 of the Universal Military Training and Service Act, as amended, provides in part:

"(g) [*Ministers of religion.*] Regular or duly ordained ministers of religion, as defined in this title, and students preparing for the ministry under the direction of recognized churches or religious organizations, who are satisfactorily pursuing full-time courses of instruction in recognized theological or divinity schools, or who are satisfactorily pursuing full-time courses of instruction leading to their entrance into recognized theological or divinity schools in which they have been pre-enrolled, shall be exempt from training and service (but not from registration) under this title".

Section 16 of the Universal Military Training and Service Act, as amended, provides in part:

"(g) (1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in the public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

"(3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization".

Selective Service regulation 1622.43 provides:

"*Class IV–D: Minister of Religion or Divinity Student*—(a) In Class IV–D shall be placed any registrant: (1) Who is a regular minister of religion; (2) Who is a duly ordained minister of religion; (3) Who is a student preparing for the ministry under the direction of a recognized church or religious organization and who is satisfactorily pursuing a full-time course of instruction in a recognized theological or divinity school; or (4) Who is a student preparing for the ministry under the direction of a recognized church or religious organization and who is satisfactorily pursuing a full-time course of instruction leading to entrance into a recognized theological or divinity school in which he has been pre-enrolled".

The classification process by the local board is designed to produce men in an orderly fashion for the armed forces. Any registrant who claims to be entitled to ministerial exemption has the responsibility of submitting evidence establishing the statutory criteria for exemption. This is made clear by § 1622.10 of the Selective Service regulations, which places the burden on the registrant to establish to the satisfaction of the local board that he should be placed in some class other than I–A, the class I–A being, of course, available for military service. The regulations emphasize that the burden of providing eligibility for any classification other than I–A rests squarely upon the registrant. See United States v. Schoebel, 7 Cir., 201 F.2d 31. Also Davis v. United States, 8 Cir., 203 F.2d 853, certiorari denied 345 U.S. 996, 73 S.Ct. 1138, 97 L.Ed. 1403.

The Selective Service Act, § 16(g), sets out what fails to constitute a "duly ordained minister" within the meaning of the Act by stating:

" * * * who irregularly or incidentally preaches and teaches the principles of religion * * *, [or] who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship * * *".

The Supreme Court stated in Dickinson v. United States, 346 U.S. 389, 74 S. Ct. 152, 156, 98 L.Ed. 132:

"The ministerial exemption, as was pointed out in the Senate Report accompanying the 1948 Act, 'is a narrow one, intended for the leaders of the various religious faiths and not for the members generally.' S.Rep.No. 1268, 80th Cong., 2d Sess. 13. Certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister. Cf. Cox v. United States, 1947, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59. On the other hand, a legitimate minister cannot be, for the purposes of the Act, unfrocked simply because all the members of his sect base an exemption claim on the dogma of its faith. That would leave a congregation without a cleric. Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing the right to the exemption".

The Supreme Court also stated in that decision:

"Local boards are not courts of law and are not bound by traditional rules of evidence; they are given great leeway in hearing and considering a variety of material as evidence. If the facts are disputed the board bears the ultimate responsibility for resolving the conflict—the courts will not interfere. Nor will the courts apply a test of 'substantial evidence.' However, the courts may properly insist that there be some proof that is incompatible with the registrant's proof of exemption. The local board may question a registrant under oath, subpoena witnesses to testify, and require both registrant and witnesses to produce documents. 32 C.F.R. § 1621.15. The board is authorized to obtain information from local, state, and national welfare and governmental agencies. 32 C.F.R. § 1621.14. The registrant's admissions, testimony of other witnesses, frequently unsolicited evidence from a registrant's neighbors, or information obtained from other agencies may produce dissidence which the boards are free

to resolve. \* \* \*" (Italics supplied.)

The Supreme Court stated in the case of Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 120:

" \* \* \* Perhaps a court or jury would reach a different result from the evidence but as the determination of classification is for selective service, its order is reviewable 'only if there is no basis in fact for the classification.' Estep v. United States, supra, 327 U.S. [114] page 122, 66 S.Ct. [623] page 427, 90 L.Ed. 567. Consequently when a court finds a basis in the file for the board's action that action is conclusive. The question of the preponderance of evidence is not for trial anew. It is not relevant to the issue of the guilt of the accused for disobedience of orders. \* \* \* "

In the Cox case, the Selective Service file revealed that Cox averaged approximately 150 hours of ministerial work per month. The Court concluded that the board was justified in deciding that Cox had not established his ministerial status.

In the case of Neal v. United States, 5 Cir., 203 F.2d 111, certiorari denied 345 U.S. 996, 73 S.Ct. 1138, 97 L.Ed. 1402, the Court upheld the denial of a ministerial status to a "Pioneer" who, at the time he was classified, performed approximately 20 hours' secular work a week and who devoted about 300 hours a month to religious activities. In its March 1953 decision, 203 F.2d at page 117, the Court said:

"Whether he is a Jehovah's Witness, or a member of another sect or denomination, a registrant's status as a minister should be determined according to the facts of his individual case, and according to the realities of the situation,—not merely by what he professes. If his work brings him within the ministerial classification, he is entitled to be so classified, but he is not entitled to

that classification merely because he proclaims himself to be a minister, nor because the religious sect to which he belongs, designates all its members as 'ministers.' Buttecali v. United States, 5 Cir., 130 F.2d 172; United States ex rel. Hull v. Stalter, 7 Cir., 151 F.2d 633. The phrase 'minister of religion' as used in the Selective Service Act must be interpreted according to the intention of Congress in adopting it, and not necessarily according to the meaning attributed to it by the members of any particular sect. Martin v. United States, 4 Cir., 190 F.2d 775."

From the facts revealed in the Selective Service file in this case and from the stipulations, this Court concludes that James Lamar Harper failed to sustain the burden placed upon him by the regulations of the Selective Service System to submit evidence which established that he was entitled to a ministerial exemption within the meaning of the Act. The Court concludes, further, that there was a basis in fact for denying the defendant's claim for exemption as a minister of religion. It is apparent to the Court and the Court concludes that James Lamar Harper's vocation was that of farming and his avocation was that of a minister. This is apparent from the agricultural questionnaire. In October 1948, this defendant owned no interest in this farm. In 1948, the farm was producing an income of less than $1,000 a year and at that time there were only 16 acres in cultivation. Between 1948 and the time the Agricultural Status Questionnaire was filed by the defendant in December 1953, the defendant had acquired part ownership of the farm. There were 35 acres in cultivation, the income from the farm had tripled, and, according to the defendant's own statement, his removal from this farm would cause a complete suspension of the farming operations. It is quite obvious from a study of the defendant's Agricultural Status Questionnaire that he was engaged in full-time farming operations

even though he stated that he only worked part time on this farm.

As stated above, the "realities of the situation" show clearly that this defendant's vocation was farming and that he was a part-time minister by avocation. There is no doubt in the Court's mind that this defendant is conscientiously opposed to the use of carnal weapons, and conscientiously opposed to carnal warfare and to military service. He, under the regulations and the cases interpreting the regulations, sustained the burden placed upon him in establishing his entitlement to a conscientious objector's classification. This he received.

The Court concludes that the denial of the defendant's claim for exemption as a minister of religion by the various administrative agencies in the Selective Service System was not arbitrary, was not capricious, was not prejudicial, and was not contrary to the Act, regulations, or existing law

The Court concludes, further, that the local board and other administrative agencies of the Selective Service System did not employ or apply any erroneous standards in determining what constitutes a minister of religion within the meaning of the Act and regulations, but, to the contrary, followed that portion of the regulations which stipulates that a "duly ordained minister" does not include a person who irregularly and incidentally preaches or teaches the principles of religion, and, further, followed that portion of the regulations which states that the term "minister" does not include those who do not regularly preach and teach as a vocation.

The Court further concludes that the Selective Service agencies did not erroneously classify this defendant as a conscientious objector and deny to him a ministerial classification solely because he did part-time secular work.

The Court further concludes that the refusal of the local board preventing the defendant from bringing personal witnesses to testify before the local board at the defendant's appearances, in order to assist him in establishing his claim as a minister, was not arbitrary or capricious, but was the exercise of the discretion invested in the Selective Service Board as an administrative body. There is no merit in the defendant's contention that § 1624.2(c) of the regulations denies and deprives the defendant of any rights granted him by § 1624.2(b) of the regulations.

The Court concludes that on or about December 6, 1954, in the Middle District of Alabama, this defendant violated the Selective Service Act and regulations in that he, being under a duty to carry out certain provisions of the Act, failed and refused to report to Local Board No. 16, Elba, Alabama, for instructions to proceed to a place to perform civilian employment in lieu of military service; that said failure on the part of the defendant was wilful and knowing.

Defendant is, therefore, guilty as charged in the indictment.